COURT OF APPEALS OF VIRGINIA


Present:  Judges Petty, Alston and Senior Judge Coleman
Argued at Alexandria, Virginia


CHRISTOPHER FARRELL

v.       Record No. 2282-10-4

WARREN COUNTY DEPARTMENT OF SOCIAL SERVICES

CHRISTOPHER FARRELL
                                                          OPINION BY
v.       Record No. 2283-10-4                    JUDGE ROSSIE D. ALSTON, JR.
                                                          JANUARY 10, 2012
WARREN COUNTY DEPARTMENT OF SOCIAL SERVICES

CHRISTOPHER FARRELL

v.       Record No. 2284-10-4

WARREN COUNTY DEPARTMENT OF SOCIAL SERVICES


FROM THE CIRCUIT COURT OF WARREN COUNTY
Dennis L. Hupp, Judge

    Thomas D. Logie for appellant.

    Neal T. Knudsen for appellee.

    (Thomas H. Sayre, on brief), Guardian *ad litem* for the infant
    children.  Guardian *ad litem* submitting on brief.


        Christopher Farrell (father) appeals the trial court's decision to terminate his parental

rights to his three infant children under Code § 16.1-283(B).  Father assigns nineteen errors to

the trial court's judgment.[1]  For the following reasons, we find no merit in father's assignments

of error and affirm the decision below.

_____

        [1] Father withdrew his fifteenth assignment of error on brief, so we will not consider it.

I.  OVERVIEW

Because this case involves multiple hearings and decisions, we begin with an overview of the process that led to the ultimate result in the trial court.  Code § 16.1-251 allows a juvenile and domestic relations district court (JDR) to enter an emergency order allowing the Department of Social Services (Department) to remove a child from his custodian's or parent's custody.  The JDR court may issue this order *ex parte* so long as it is accompanied by a petition alleging that the child is abused or neglected and an affidavit or sworn testimony in person before a judge or intake officer.  Code § 16.1-251.  That affidavit or sworn testimony must establish that the child "would be subjected to an imminent threat to life or health to the extent that severe or irremediable injury would be likely to result" without the removal and that the Department has made reasonable efforts to prevent the removal but there are no less drastic alternatives that would "reasonably protect the child's life or health pending a final hearing on the petition." Code § 16.1-251(A).

The JDR court must then hold a preliminary removal hearing within five business days of the child's removal.  Code § 16.1-251(B).  At the preliminary hearing, the Department must prove by a preponderance of the evidence the same elements required to obtain the emergency removal order, specifically 1) imminent threat of injury or irremediable harm; 2) reasonable efforts to prevent removal from the home; and 3) no less drastic alternative than removal exists, for the JDR court to continue the child's removal from the home.  Code § 16.1-252(E). Additionally, the JDR court "shall determine whether the allegations of abuse or neglect have been proven by a preponderance of the evidence," unless the parents or custodian, guardian *ad litem* or petitioning department objects.  Code § 16.1-252(G).  If a party to the proceeding objects, then the JDR court must schedule an adjudicatory hearing on a date within thirty days of the preliminary hearing.  Id.  If no party objects, and the JDR court finds that the child at issue

was abused or neglected, the JDR court must schedule a dispositional hearing for a date within seventy-five days of the preliminary hearing. Code § 16.1-252(H).

Regardless of whether the JDR court requires the Department to prove the abuse or neglect at the preliminary removal hearing or the adjudicatory hearing, the Department will have to establish that the child is abused or neglected under one of the definitions listed in Code § 16.1-228. For ease of reference, throughout this opinion we will refer to the JDR court's and trial court's decision on this issue as the "abused or neglected determination."

As noted above, once the JDR court finds a child to be abused or neglected, it may proceed to the dispositional hearing and take evidence on one of the dispositions listed in Code § 16.1-278.2. Code § 16.1-278.2(A)(7) allows, *inter alia*, the JDR court to "[t]erminate the rights of the parent pursuant to [Code] § 16.1-283." Because this case involves a termination of parental rights under Code § 16.1-283, we will refer to this final stage as either the "dispositional hearing" or the "termination decision." It is critical to understand that regardless of what subsection of Code § 16.1-283 the Department proceeds under, it must prove each of its allegations by clear and convincing evidence before the JDR court may terminate a parent's parental rights to his or her child. Santosky v. Kramer, 455 U.S. 745, 747-48 (1982). Moreover, a dispositional order entered pursuant to this statutory scheme is a final order from which a party may appeal in accordance with Code § 16.1-296. Finally, when an appeal is taken to the circuit court in a case involving termination of parental rights brought under Code § 16.1-283, the circuit court is obligated to hold a *de novo* hearing on the merits of the case within ninety days of the perfecting of the appeal. Code § 16.1-296(D).

## II. FACTS AND PROCEEDINGS BELOW

On appeal, "we view the evidence and all reasonable inferences in the light most favorable to the prevailing party below, in this case the Department." Jenkins v. Winchester

Dep't of Soc. Servs., 12 Va. App. 1178, 1180, 409 S.E.2d 16, 18 (1991) (citing Martin v. Pittsylvania Cnty. Dep't of Social Servs., 3 Va. App. 15, 20, 348 S.E.2d 13, 16 (1986)).

## A.  The First Removal

So viewed, the evidence indicated that mother has been married to father at all relevant times in this case, and father is the biological father of all the children involved in this case. Their daughter, E., was born on November 17, 2005.  On the same day mother tested positive for cannabinoid, an illegal drug.  On November 12, 2006, mother gave birth to premature twins, A. and W., and the twins tested positive for cocaine at birth.  Just two days later, on November 14, 2006, mother tested positive for cocaine and tetrahydrocannabinol ("THC").  Mother did not obtain prenatal care prior to the births of the children and did not know she was having twins until shortly before they were born.

On November 17, 2006, the Warren County Department of Social Services (the "Department") summarily removed all three children from mother and father's home.  Following a hearing, the juvenile and domestic relations district court ("JDR court") found that all three children were abused or neglected as defined in Code § 16.1-228(1), each of them being a child:

> Whose parents or other person responsible for his care creates or inflicts, threatens to create or inflict, or allows to be created or inflicted upon such child a physical or mental injury by other than accidental means, or creates a substantial risk of death, disfigurement or impairment of bodily or mental functions.

In January 2007, the JDR court entered a dispositional order, vesting custody of all three children with the Department.  The JDR court also approved foster care plans for the children, requiring both mother and father to:  maintain adequate housing, maintain income, provide household bills to the Department, maintain contact with the children, complete parental capacity evaluations, complete substance abuse evaluations and treatment, submit to drug screens, and execute releases so the Department could monitor the situation.  In July 2007, the Department

returned the three children to mother's and father's physical custody. In October 2007, mother and father completed their obligations under the foster care plans, and the JDR court restored full legal custody to them for all three children.

### B. A.'s Medical Problems and the Second Removal

On November 16, 2007, mother and father brought A. to a medical appointment with his pediatrician, Dr. Deborah Dunn. Dr. Dunn expressed concerns to mother and father about A.'s low weight and malnourishment. A. was suffering from what Dr. Dunn later discovered was a milk allergy. Dr. Dunn scheduled a follow-up appointment for December 17, 2007, but neither parent brought A. to see Dr. Dunn on that date, nor did they reschedule the appointment.

On March 17, 2008, mother took A. to the emergency room at Warren County Memorial Hospital ("Warren County") because he was vomiting uncontrollably.[2] On April 2, 2008, Dr. Dunn saw A. again for the first time since the November 2007 appointment, when A. was referred to her after mother brought him to the emergency room for vomiting. Dr. Dunn testified that, at this point, A. was extremely thin and very sick, vomiting, and listless. Dr. Dunn admitted A. to Warren County, where he spent a week recovering from his malnourishment. At trial, Dr. Dunn testified that she had never seen another child so malnourished from a milk allergy. Dr. Dunn also noted that A.'s condition would not have become so severe if mother or father had brought A. for his scheduled follow-up visit in December 2007.

On April 30, 2008, father allegedly returned from speaking with someone outside the home and found A. draped over a chair with one side of his body rigid, appearing as if he were

---

[2] At trial, mother provided various conflicting accounts of how A. sustained a head injury shortly before the vomiting began. She testified that although father told her that A. had fallen down the stairs prior to this visit, she did not tell the doctors about it. Mother also testified that a few days prior A. had hit his head on a coffee table, but she did not seek any treatment for A. at that time because he did not cry or seem hurt. She did acknowledge that the blow left a mark. Additionally, mother asserted that W. hit A. on the head with a toy truck later in March.

having a seizure. Father administered rescue breathing and called for an ambulance. Mother was not present at the home when this incident occurred but drove to the emergency room after hearing of the incident while father stayed at home with the other two children. After Dr. Dunn stabilized A. in the emergency room at Warren County, she transferred him to University of Virginia Children's Hospital ("UVA"). A.'s treating physician and specialists at UVA diagnosed him with subdural hematomas of varying ages along with bilateral retinal hemorrhaging. Dr. Patricia Scherrer, a pediatric critical care specialist who examined A. and oversaw his treatment at UVA, concluded that A.'s head injuries were most consistent with non-accidental trauma. Dr. Scherrer based this conclusion on the lack of history to explain A.'s injuries and further testified that none of the parents' proposed explanations – A.'s allegedly hitting his head on the coffee table or being hit on the head with a toy truck – could have caused the type of injuries A. had sustained. Dr. Scherrer testified, contrary to mother's explanations at trial, that she knew nothing about a fall down the stairs but that she believed it could not have caused A.'s injuries. Mother admitted at trial that she did not tell Dr. Scherrer about the fall.

Dr. Dunn reviewed the reports from UVA and testified at trial that she also believed A.'s injuries were consistent with non-accidental trauma. Dr. Charles Richards, an ophthalmologist who examined A. at UVA, testified that he took retinal photos of A.'s eyes and concluded that he had bilateral retinal hemorrhaging. When asked about the cause of the hemorrhaging, Dr. Richards stated that he did not have enough information about A.'s history and tests other treating specialists conducted to form an opinion to a reasonable degree of medical certainty. Similarly, Dr. John Jane, Jr., the pediatric neurosurgeon tending to A. at UVA, also could not form an opinion to a reasonable degree of medical certainty as to the cause of A.'s injuries. Dr. Jane stated that he examined A. only one time and reviewed brain scans to determine whether A. would need surgery.

On May 1, 2008, the Department filed a petition for emergency removal of the three children and removed them from the parents' custody a second time. The following day, May 2, 2008, the Warren County Sheriff's Office started an investigation regarding the circumstances of A.'s injuries. Investigator Raymond Fogle interviewed mother and father about A.'s injuries. During this interview, father told Investigator Fogle that A. had fallen down some stairs in the family home in early March 2008. Investigator Fogle was unable to conduct any further interviews with mother and father because their attorneys advised the sheriff's office that neither parent would make any additional statements to the police while the civil case proceeded through the courts.

At trial father testified consistent with his discussion with Investigator Fogle about the fall. Father stated that he had put a gate up at the top of the stairs and went down to the basement. He guessed that A. and E. struggled at the gate and A. somehow fell down the stairs into the basement. Father testified that he found A. unconscious at the bottom of the stairs and had succeeded in reviving him through infant CPR. After A. regained consciousness, father stated that A. began running and playing with his siblings and, as a result, father did not seek medical attention for him.

## C. Proceedings in the JDR court

After the Department removed the children from the parents a second time, the JDR court held a preliminary hearing on May 9, 2008. The parents objected to the JDR court's determination of abuse or neglect at this hearing, and the JDR court set an adjudicatory hearing for June 6, 2008. At that hearing – which actually occurred on July 8, 2008 – the JDR court found that A. was abused or neglected and that E. and W. were at risk of being abused or neglected due to the parents' treatment of A. The JDR court then scheduled the dispositional hearing for September 19, 2008, noting that the parties waived the requirement for a hearing

within seventy-five days. On September 11, 2008, the Department filed petitions for termination and petitions requesting a foster care review hearing with the stated goal of adoption for each child.

After the dispositional hearing, the JDR court entered an order on January 12, 2009, terminating both parents' parental rights to the three children pursuant to Code § 16.1-283(B). Both parents appealed to the circuit court. The circuit court (hereinafter "trial court") held evidentiary hearings *de novo* on November 5, 6, and 30, 2009, to determine the merits of the abuse or neglect allegations. After determining that the children were abused or neglected, the trial court set a dispositional hearing for December 8, 2009.

### D. The Abused or Neglected Determination in the Trial Court

At the hearing on the abuse or neglect petition, Jennifer Mundy testified that she had been the children's foster mother during the first removal from November 2006 through July 2007. She asserted that father had called her in early April 2008, looking for work. Mundy stated that when she asked about the children, father admitted that A. had fallen down the stairs but said he and mother brought him to the hospital because A. started uncontrollably vomiting a few days later. Additionally, Mundy testified that during the same conversation, father said that mother told the Department that A. had hit his head on a coffee table because they were worried about the Department taking the children again. According to Mundy, father gave her the room number for A. at the hospital, and Mundy called the room to talk with mother. Mundy testified that when she told mother she knew about the fall down the stairs, mother said, "[Father] shouldn't have told you that," and that "the doctors know enough already."

The parties presented testimony and physical exhibits over the course of the three-day hearing on the abused or neglected determination as summarized above. At the end of the second day of the hearing, the Department concluded its evidence, and mother made a motion to

strike. Mother argued in her motion that there was no evidence that E. and W. had actually been abused or neglected and that the trial court did not have jurisdiction to find E. and W. abused or neglected solely by reason of A.'s abuse or neglect. After argument on mother's motion, father made a motion to strike on similar grounds. The trial court denied both motions, stating:

> I find, first, that the Court has jurisdiction of these cases under [Code §] 16.1-241. With respect to [A.], keeping in mind the standard here is a prima facie case, and . . . whether the [D]epartment has made a prima facie case that's shown that he's been abused or neglected by his parents and also, of course we know that the evidence [is viewed] in the light most favorable to the [D]epartment at a motion to strike stage.
>
> But applying that standard, there's ample evidence to show that [A.] has been abused and neglected by his father and neglected by his mother.
>
> Now, as far as the other children are concerned, this is a more difficult analysis. Again, at this stage, I find that the [D]epartment has shown a prima facie case that the other two are at risk because of the abuse and neglect of [A.], and I'm looking at [Code §] 16.1-278.2 . . . when I say that, but also, I find that there's a prima facie that they, too, are abused or neglected under the definition contained in [Code §] 16.1-228.

Following the court's denial of the motions to strike, mother presented her case-in-chief. Mother testified that she had another child in June 2009, F., and that she had not obtained prenatal care during her pregnancy with F. Mother explained that she did not have medical insurance during her pregnancy but was receiving Medicaid for F., and F.'s drug test at birth came back negative. Mother also asserted that F. was a healthy baby, and the Department had not initiated any investigation into mother's and father's treatment of F. Mother admitted on more than one occasion during the trial that she and father had gotten into a physical altercation during an argument in January 2007. Although it was unclear who called the police, officers came to the home and arrested father. Mother testified that the case against father related to that incident was eventually dismissed.

In his case-in-chief, father testified that the January 2007 argument and physical altercation occurred when he was reviewing bills and confronted mother about approximately $8,000 that was missing. When asked whether mother had used that money to purchase drugs, father was unwilling to concede that he believed she had. He testified that he never found out what happened to the money and that it was still missing. Father did state, however, that he found mother's cocaine source and firmly told the person that mother was pregnant (with the twins W. and A.) and to stop selling drugs to her. When asked about the children's interactions with one another, father described A. as "selfish, spoiled," and needing "to be the center of attention." Father also testified that if the children were returned he would have to "work on [A.'s] attitude."

Following closing arguments, the trial court stated:

> All right. Well, it's clear to me that [A.] was abused and neglected. The types of injuries that he sustained are not injuries that you get in routine play, falls around the house. It takes a great violence to inflict that type of injury, bilateral subdural hematoma, bilateral retinal hemorrhages, which were diffuse. These are a result of, again, great violence.
>
> Of course, the additional disturbing thing with respect to the subdural hematomas is that they were of various ages, which would indicate that he perhaps suffered the same type of abuse in the past.
>
> No explanation has been offered by the person in whose care he was at the time as to how this happened. I have no hesitation in finding [father] abused [A.] and inflicted these injuries, given the evidence that I have heard.
>
> [Father's] credibility has suffered in this courtroom because of the contradictions and inconsistencies in his testimony and the contradictions between the testimony of the two parents. I also find from his testimony that there is some animus towards [A.]; he's selfish; he's an attention-getter; he's difficult; he throws temper tantrums, and all this stuff, almost as if shifting the blame to [A.] for this whole episode.

As far as neglect, I think both parents are guilty of neglect. It went far too long between doctor visits when [A.] was a malnourished child, I mean, 16 pounds at 18 months of age. So there's no question that [A.] is abused and neglected, abused and neglected by [father] and neglected by [mother].

Now, the more difficult question remains with respect to [W.] and [E.], and quite frankly, I need some time to think about that.

The following day, December 1, 2009, the trial court issued a memorandum opinion to counsel reiterating its findings that father abused and neglected A. and mother neglected A. The memorandum opinion also stated:

I find that [E.] and [W.] are in danger of death, disfigurement or impairment of bodily or mental functions at the hands of their parents by reason of the abuse and neglect of their sibling, [A.] This latter form of abuse or neglect is recognized by statute. I refer to . . . Code § 16.1-278.2(A). Hence, I find that they are abused and/or neglected under the definition set forth in . . . Code § 16.1-228(1). In making this determination, I also have in mind the history of these parents which includes a previous removal of these children from their home . . . .

E. The Dispositional Hearing in the Trial Court

On December 8, 2009, the trial court held a dispositional hearing to determine whether to grant the Department's petitions to terminate the parents' parental rights to all three children.

The Department commenced its case with the testimony of Dr. Bernard Lewis, a clinical psychologist and expert in parental capacity examinations. Dr. Lewis testified that he had evaluated both mother and father in 2007 at the Department's request and then again in 2009 to update the 2007 evaluations. Specific to mother, Dr. Lewis testified that she suffered from major depressive disorder, engaged in episodic cannabis abuse, had a history of cocaine abuse in apparent full remission, and had negative, paranoid, and dependent personality features. Dr. Lewis testified that during his interviews with mother, she admitted she had lied to him during the 2007 evaluation about her substance abuse issues. Dr. Lewis also noted that mother

was affected by a dysfunctional marital relationship, financial problems, and difficulty accessing mental health care.

Specific to mother's parenting abilities, Dr. Lewis testified that mother's parenting skills were basically good, indicating her potential to adequately parent the children if she could resolve certain issues including depression, substance abuse, and her relationship with father. Dr. Lewis emphasized that if mother were unable to acknowledge that someone abused A., she would be likely to allow A. to be in a similar situation again and thus, put at risk.

In response to further questioning, Dr. Lewis made several recommendations under the hypothetical assumption that the trial court would return the children to mother. He stated that she would need a prescription medication for depression along with individual counseling for her relationship problems with father and for substance abuse. Dr. Lewis admitted that some people with drug abuse problems need to go through counseling four or five times before they are able to remain completely abstinent and that there was no way to predict whether a second round of substance abuse counseling would be successful for mother.

Dr. Lewis testified that his evaluation of father led him to conclude that father suffered from alcohol dependence, a history of polysubstance abuse – most recently marijuana, narcissistic personality disorder with antisocial traits, and back pain and cognitive impairment. Dr. Lewis also testified that father thought that he was the victim of a conspiracy in which others were out to harm him. Dr. Lewis further stated that father's occupational and financial problems were affecting him negatively.

Specific to father's parenting abilities, Dr. Lewis found considerable problems with father's approach. First, Dr. Lewis stated that father lacked understanding about children's developmental stages and had a poor understanding of his own strengths and weaknesses. When reviewing father's disciplinary approach, Dr. Lewis noted that father would remove the children

from the situation and yell at them and that father believed "growling" worked well.  Second, Dr. Lewis testified that father was unable to simply have a few drinks but regularly consumed alcohol to the point that he engaged in behaviors that were dangerous and inappropriate related to his parenting abilities.  Dr. Lewis further emphasized that father could not think of anything he could have done differently prior to the children's recent removal except that he would have taken the children to the doctor instead of letting mother do it, and would have told the Department, "No, you're not taking my kids."  Additionally, Dr. Lewis noted father's admission that he found dealing with A. "trying" and that he needed a "refresher course" on how to handle A.  Dr. Lewis explained that he felt father was a danger to the children for a number of reasons: his history with substance abuse and inability to control it; the history of physical violence between father and mother; the personality disorder that caused him to not be able to see his own faults and weaknesses but blame others; his limited parenting ability, especially with special needs children [3]; and that A. suffered injuries while in father's care, and the court's determination that he was at fault for them.

When asked for his recommendations regarding father, Dr. Lewis stated that father had "a great deal of work to do" before he could be considered a minimally adequate parent. Dr. Lewis also testified that he had serious concerns about father's parenting ability should father and mother remain together and get the children back.  Dr. Lewis recommended that before the trial court or Department returned the children to father, father attend a sobriety maintenance support program to help him remain free of alcohol and drug usage and engage in individual counseling.  Most relevant to the children, Dr. Lewis recommended that the trial court require father to attend and complete an individualized parenting skills program that included specific

---

[3] Although the parties disagree as to the timing, they agreed that, at some point, doctors identified A. as a special needs child.

education about A.'s developmental and emotional issues and provided techniques for addressing the issues in the home.

The Department then presented the testimony of one of its representatives, Melanie Trabosh. Ms. Trabosh testified about the Department's unsuccessful efforts to find a family member willing to take custody of the three children. She noted that the children's current foster family was willing to adopt them. Ms. Trabosh admitted that the Department's initial pleading included a goal of adoption following the most recent removal, not returning the children to the parents, because the parents refused to discuss A.'s injuries with them. Without any discussions, Ms. Trabosh testified, she was unable to generate a list of services to provide to mother and father.

Estelle Wilson, the children's current foster mother, corroborated Ms. Trabosh's testimony that Ms. Wilson and her husband were willing to adopt the children. She testified about the positive behavioral changes in each child and their attitudes toward one another since they began living with her. Ms. Wilson also mentioned that she and her husband received training for children with special needs.

Following Ms. Wilson's testimony, and at the conclusion of the Department's case, mother and father both made motions to strike the Department's evidence supporting the petitions for termination. Father's motion to strike raised three issues. First, father argued that the petitions for termination were premature because the trial court had not entered a final order adjudicating the children to be abused or neglected and the Department had not filed a foster care plan. Second, father contended that the record contained no evidence of how A. was injured aside from the parents' testimony about the fall down the stairs, the coffee table incident, and the toy truck incident. Therefore, according to father, even accepting the trial court's finding about A.'s abuse and neglect, the record contained no evidence that E. and W. were ever in severe

- 14 -

danger to justify termination under the statute. Third, father asserted that the Department failed to produce sufficient evidence for the trial court to find that the parents could not remedy the conditions resulting in the removal in a reasonable period of time. The trial court denied father's motion and noted that the Department had a stronger case for termination against father than it had against mother. The trial court also denied mother's motion to strike based on similar rationale.

Following the motions to strike, Ms. Trabosh testified again; this time as part of mother's case-in-chief. Ms. Trabosh testified that she felt mother's contact with the Department was insufficient because an unknown abuser inflicted a severe injury on A. and mother continued to deny that someone intentionally harmed A. Ms. Trabosh mentioned that mother told Ms. Trabosh that mother looked on the Internet for other potential causes for A.'s brain injuries even after discussing the medical diagnosis with Dr. Dunn and Dr. Scherrer. In support of her case, mother testified that she benefited from the Department's services when the Department removed the children the first time and believed she could benefit from further services. Mother also asserted that she would do whatever the Department asked, including leaving father and preventing him from having any contact with the children. Mother again denied any medical neglect of A. other than "missing one doctor's appointment." Mother admitted that she smoked marijuana after the Department removed the children the second time, in May 2008.

Father's mother, Irene Farrell, testified on father's behalf. She stated that she wanted to adopt only one of the children, E., because she did not think her health problems and age would permit her to take care of all three children. Ms. Farrell admitted that father threatened father's sister, Ms. Farrell's daughter, when the sister had custody of the children during the first removal. Additionally, Ms. Farrell stated that the parents told her that the Department removed the children because A. had fallen down the steps or hit his head on a coffee table.

At the close of the evidence, both parties renewed their motions to strike. The trial court denied both motions, and the parties presented closing arguments. The trial court took the matter under advisement and eventually entered orders terminating both mother's and father's parental rights to all three children. As to A., the trial court found that father abused him and mother neglected him. Further, the trial court found by clear and convincing evidence that it was in A.'s best interest to terminate both parents' rights to him and that the neglect or abuse A. suffered presented a serious and substantial threat to his life, health, and development. Specifically, the trial court concluded:

> The abuse of [A.] by [father] constitutes "aggravated circumstances" as defined by Code [§] 16.1-283. It is not reasonably likely that the conditions which resulted in such neglect or abuse can be substantially corrected or eliminated so as to allow [A.'s] safe return to his parents within a reasonable period of time. In making this determination, the court takes into consideration the efforts made to rehabilitate the parents by public and private social, medical, mental health and other rehabilitative agencies prior to [A.'s] initial placement in foster care. [A.] suffered grievous injuries and the Court rejects the parents' explanation for same. The Court considers the entire case in the context of this being the second removal of [A.] by the courts. The Court further notes that substance abuse was a significant factor in the first removal, and substance abuse continued to be a problem following the return of the children . . . .

The trial court also terminated both parents' rights to E. and W. In separate orders, the trial court made identical findings that both E. and W. were abused or neglected children whose best interest was served by terminating both parents' rights to them. Particularly, the trial court stated:

> The Court . . . further does find, by clear and convincing evidence, that:
>
> \*    \*    \*    \*    \*    \*    \*
>
> 3. The neglect or abuse suffered by [E./W.] presented a serious and substantial threat to [her/his] life, health and development. It is not reasonably likely that the conditions which

resulted in such neglect or abuse can be substantially corrected or eliminated so as to allow [E.'s/W.'s] safe return to [her/his] parents within a reasonable period of time. In making this determination, the court takes into consideration the efforts made to rehabilitate the parents by public and private social, medical, mental health and other rehabilitative agencies prior to [E.'s/W.'s] initial placement in foster care. [E.'s/W.'s] brother [A.] suffered grievous injuries, and the Court rejects the parents' explanation for same. I find that [E./W.] is in danger of death, disfigurement or impairment of bodily or mental functions at the hands of [her/his] parents by reason of the abuse and neglect of [her/his] sibling, [A.]. This latter form of abuse or neglect is recognized by statute. I refer to Code § 16.1-278.2(A). Hence, I find that [she/he] is abused and/or neglected under the definition set forth in Code § 16.l-228(1). In making this determination, I also have in mind the history of these parents which includes a previous removal of [E./W.] from [her/his] home. Substance abuse was a significant factor in the first removal, and substance abuse continued to be a problem following the return of the children . . . .

For all three children, the trial court further found that the Department investigated all reasonable options for placement with relatives, and no reasonable alternatives existed.

Both parents timely noted their appeals. During the pendency of the appeal, father and mother filed identical motions to vacate the judgments for fraud on the court. The Department filed a written response, and the trial court concluded that it did not have jurisdiction because the cases were on appeal to this Court. Neither party noted any subsequent appeals following that order.

III. ANALYSIS

When reviewing a termination of a parent's residual parental rights, it would be unfitting to not acknowledge that "'[t]he termination of parental rights is a grave, drastic and irreversible action.'" Helen W. v. Fairfax Cnty. Dep't of Human Dev., 12 Va. App. 877, 883, 407 S.E.2d 25, 28-29 (1991) (quoting Lowe v. Dep't of Pub. Welfare, 231 Va. 277, 280, 343 S.E.2d 70, 72 (1986)). While recognizing the seriousness of such a determination, we must presume that the trial court "'thoroughly weighed all the evidence, considered the statutory requirements, and

- 17 -

made its determination based on the child's [or children's] best interests.'" Fields v. Dinwiddie Cnty. Dep't of Soc. Servs., 46 Va. App. 1, 7, 614 S.E.2d 656, 659 (2005) (quoting Farley v. Farley, 9 Va. App. 326, 329, 387 S.E.2d 794, 796 (1990)).  Moreover, in a parental rights termination case, "[t]he trial court's judgment, 'when based on evidence heard *ore tenus*, will not be disturbed on appeal unless plainly wrong or without evidence to support it.'" Toms v. Hanover Dep't of Soc. Servs., 46 Va. App. 257, 266, 616 S.E.2d 765, 769 (2005) (quoting Fields, 46 Va. App. at 7, 614 S.E.2d at 659).  "In its capacity as a factfinder . . . the [trial] court retains 'broad discretion in making the decisions necessary to guard and to foster a child's best interests.'" Id. (quoting Farley, 9 Va. App. at 328, 387 S.E.2d at 795).  The trial court's paramount consideration in a termination case is the best interests of the children.  See Logan v. Fairfax Cnty. Dep't of Human Dev., 13 Va. App. 123, 128, 409 S.E.2d 460, 463 (1991).

A.  Assignments of Error 1 and 2:  Constitutional due process and termination of parental rights

Father argues that the trial court deprived father of his constitutional due process rights on two grounds.  First, father asserts that the trial court erred in applying the preponderance of the evidence standard to its determination about father's abuse and neglect of the three children.[4]  Second, father argues that the trial court erred in upholding the constitutionality of the relevant

---

[4] Assignment of Error 1 states:

> The trial court erred in applying the preponderance of the evidence standard for a finding of abuse and neglect on the part of [father] against each of the three children in this case when the standard under the Due Process Clause of the United States Constitution to terminate a fundamental right such as the right of a parent to parent a child and the right of a child to his or her parents' care must be clear and convincing evidence rather than preponderance of the evidence.

Virginia statutes, claiming that the statutes allow termination of parental rights based on a trial court's finding of abuse or neglect by the preponderance of the evidence.[5]

Because both challenges require us to interpret a statute and the Due Process Clause, we approach them as questions of law and apply a *de novo* standard. Wilson v. Commonwealth, 58 Va. App. 513, 519, 711 S.E.2d 251, 254 (2011).

Father's first assignment of error assumes that the trial court determined that father abused or neglected all three children under a preponderance of the evidence standard, and he argues that doing so violated his due process rights. Father's assumption ignores the plain language of the trial court's final termination orders for each child. In the final termination order for A., the trial court stated:

> The Court further finds . . . *by clear and convincing evidence*, that:
>
> \*    \*    \*    \*    \*    \*    \*
>
> The neglect or abuse suffered by [A.] presented a serious and substantial threat to his life, health and development. The abuse of [A.] by [father] constitutes "aggravated circumstances" as defined by Code [§] 16.1-283 . . . . [A.] suffered grievous injuries and the Court rejects the parents' explanation for same.

(Emphasis added).

The trial court made identical findings in its final termination orders for E. and W., stating:

> The Court further finds . . . *by clear and convincing evidence*, that:
>
> \*    \*    \*    \*    \*    \*    \*
>
> I find that [E. and W. are] in danger of death, disfigurement or impairment of bodily or mental functions at the hands of her [/his] parents by reason of the abuse and neglect of her [/his] sibling,

---

[5] Assignment of Error 2 states: "The trial court erred in upholding the Virginia statutes against Federal Constitutional attack to the extent that they permit removal of a child or termination of parental rights to a child based on a finding of abuse or neglect by the preponderance of the evidence."

- 19 -

[A.]. This latter form of abuse or neglect is recognized by statute. I refer to Virginia Code § 16.1-278.2(A). Hence, I find that she [/he] is abused and/or neglected under the definition set forth in Virginia Code § 16.l-228(1).

(Emphasis added).

Father is correct in his primary position that, consistent with the United States Supreme Court's decision in <u>Santosky v. Kramer</u>, 455 U.S. 745, 747-48 (1982), the Department needed to prove each of its allegations supporting termination of parental rights by clear and convincing evidence. Consistent with this standard, the trial court's final orders did indeed indicate that it held the Department to that higher standard; and the Department satisfied that burden. Accordingly, we find no merit in father's first assignment of error.

Father's second assignment of error charges that the trial court erred in finding that Code § 16.1-283(B) passes constitutional muster because it allows termination based on a finding of abuse or neglect by a preponderance of the evidence. We have previously evaluated Code § 16.1-283(B) based on a procedural due process challenge. In <u>Wright v. Alexandria Div. of Soc. Servs.</u>, 16 Va. App. 821, 829, 433 S.E.2d 500, 505 (1993) (citing <u>Santosky</u>, 455 U.S. at 753-54), we recognized that "[w]hen a state infringes upon a parent's constitutional right to the companionship of his or her child in order to protect the child from abuse and neglect, it must satisfy the mandates of procedural due process." In the context of terminating a parent's rights, the Due Process Clause requires that the Department prove each of the necessary allegations of parental unfitness by clear and convincing evidence. <u>Id.</u> (citing <u>Santosky</u>, 455 U.S. at 768-69). In <u>Wright</u>, we confirmed that Code § 16.1-283(B) complies with the Due Process Clause because it requires the Department to prove:

> [B]ased upon *clear and convincing evidence*, that . . . [termination] is in the best interests of the child and that:

1. The neglect or abuse suffered by such child presented a serious and substantial threat to his life, health or development; and

2. It is not reasonably likely that the conditions which resulted in such neglect or abuse can be substantially corrected or eliminated so as to allow the child's safe return to his parent or parents within a reasonable period of time . . . .

See Wright, 16 Va. App. at 829-30, 433 S.E.2d at 505 (emphasis added).

Father does not challenge these elements of Code § 16.1-283(B) directly; rather, father argues that under this statutory scheme a trial court can evaluate a case for termination having found that a child was abused or neglected by only a preponderance of the evidence in a prior hearing. This argument ignores the plain language of Code § 16.1-283(B)(1), which requires the trial court to find by clear and convincing evidence that: "The neglect or abuse suffered by such child presented a serious and substantial threat to his life, health or development." By requiring the trial court to make this finding, the statute's plain language mandates that the trial court not only find that the child was abused or neglected, but also that the child was abused or neglected to a heightened degree, i.e., to such an extent that there is a serious threat to his life, health, or development. Stated succinctly, a trial court cannot terminate a parent's rights to his child based solely upon a finding in a prior hearing that the child was abused or neglected. The trial court must find that the abuse or neglect rose to a level that presented a substantial threat to the child's life, health, or development, and Code § 16.1-283(B)(1) requires that this finding be made *upon a showing of clear and convincing evidence*.

Moreover, father's argument assumes that once a trial court makes the initial abused or neglected finding by the preponderance of the evidence standard and then proceeds to a dispositional hearing where termination is a possibility, that termination will occur without the Department having to prove anything beyond that initial finding. This suggestion could not be more incorrect. Code § 16.1-283 requires much more before a trial court may terminate a

parent's rights to his child. Not only must the Department prove that the child was abused or neglected to the degree that his life, health, or development is substantially threatened, but it must also prove that it is not reasonably likely that a parent could substantially remedy the conditions that resulted in the neglect or abuse. Thus, a trial court cannot base its decision to terminate parental rights on a previous preliminary finding, (by the preponderance of the evidence), that a child is abused or neglected.

The severity of permanently separating children from their parents is a significant and compelling circumstance, but we reconfirm herein that Virginia's statutes provide parents with "'fundamentally fair'" procedures under the Due Process Clause. Wright, 16 Va. App. at 829, 433 S.E.2d at 505 (quoting Lassiter v. Dep't of Soc. Servs., 452 U.S. 18, 33 (1981)). Accordingly, we find no merit in father's second assignment of error.

B. Assignment of Error 3: Father's motion to dismiss the termination petitions as premature

Father argues that the trial court erred in denying his motion to dismiss the Department's petitions for termination as premature because the trial court had not previously adjudicated the children as abused or neglected before the Department filed the petitions. Additionally, father contends that trying the abused or neglected petitions simultaneously with the termination petitions violated Code §§ 16.1-281 through -283 in that it deprived him of the opportunity to argue in a separate foster care review and termination proceeding that the Department should have started with a goal of returning the children home.[6] Because father challenges the trial

_____

[6] Assignment of Error 3 states:

> The trial court erred in overruling [father's] motion to dismiss the
> petitions for termination of parental rights as premature because
> there had been no finding of abuse/neglect at the time these
> petitions were brought; trying the abuse/neglect petitions
> simultaneously with the termination petitions violated Code
> §§ 16.1-281 through -283 inclusive by depriving [father] of the
> right to participate in a separate foster care review and termination

court's interpretation of the relevant code sections and the procedures they dictate, we review this assignment of error as a question of law and therefore apply a *de novo* standard. See Syed v. ZH Techs., Inc., 280 Va. 58, 69, 649 S.E.2d 625, 631 (2010).

The record indicates that the JDR court entered adjudicatory orders regarding abuse or neglect for all three children on July 8, 2008. The Department then filed petitions for a foster care review hearing with a goal of adoption on August 22, 2008. On September 11, 2008, the Department filed the petitions for termination with the JDR court. The JDR court entered final orders terminating both parents' rights to the three children on January 12, 2009. Both parents timely noted their appeals to the trial court. The trial court concluded the abused or neglected hearings on November 30, 2009, and entered its memorandum opinion finding all three children abused or neglected on December 1, 2009. The trial court then held a dispositional hearing on December 8, 2009, to determine whether to grant the Department's petitions to terminate the parents' rights to all three children. It is unclear from the record on what date the Department filed the petitions for the foster care review hearing and the petitions for termination made in the JDR court with the trial court. However, an appeal from the JDR court to the trial court transfers the records from the JDR court to the trial court as though the case had originally been brought there. See Mahoney v. Mahoney, 34 Va. App. 63, 66, 537 S.E.2d 626, 628 (2000) (citing Code §§ 16.1-106 and -113; Addison v. Salyer, 185 Va. 644, 650, 40 S.E.2d 260, 263 (1946)). Moreover, the trial court affirmed on the record at the December 8, 2009 dispositional hearing that both the petitions for foster care review with a goal of adoption and the termination petitions filed in JDR court were filed in the trial court and made part of the record.

proceeding and to argue in that proceeding that the goal should
have started as returning the children home to their parents.

Father concedes that a trial court may hold one hearing to simultaneously evaluate a foster care plan and make a termination decision, but argues that, when read together, Code §§ 16.1-281 through -283 require a separate proceeding to make the abused or neglected determination and the termination decision. Code § 16.1-283(A) states, in pertinent part:

> The residual parental rights of a parent or parents may be terminated by the court as hereinafter provided in *a separate proceeding* if the petition specifically requests such relief. No petition seeking termination of residual parental rights shall be accepted by the court prior to the filing of a foster care plan, pursuant to [Code] § 16.1-281, which documents termination of residual parental rights as being in the best interests of the child. The court may hear and adjudicate a petition for termination of parental rights in the same proceeding in which the court has approved a foster care plan which documents that termination is in the best interests of the child . . . .

(Emphasis added).

Father's argument ignores our decision in Stanley v. Fairfax Cnty. Dep't of Soc. Servs., 10 Va. App. 596, 395 S.E.2d 199 (1990). In Stanley, we directly addressed the meaning of "separate proceeding" in this statute:

> We construe the term "separate proceeding" as used in Code § 16.1-283 to mean a hearing separate and distinct from an abuse and neglect adjudication, entrustment disposition, or foster care placement and review. *This does not mean, however, that a totally separate case must be initiated in the juvenile court.* Rather, the statute requires that initially, a petition must be filed specifically requesting termination of parental rights so that proper notice is given. Because of the potentially drastic consequences of a termination proceeding, *a separate hearing must be conducted to ensure that the termination issue is not confused with other issues which may have been before the court previously.* This interpretation of the term "separate proceeding" is consistent with the juvenile court statutory framework. We find that the legislature intended that this framework, rather than general rules of civil procedure, govern the manner in which cases are filed and proceed within the juvenile courts.

Id. at 601-02, 395 S.E.2d at 202 (emphasis added).

- 24 -

Therefore, because the term, "separate proceeding" only requires the trial court to hold a separate hearing to ensure that the termination issue was not confused with other issues to be resolved under the statutory scheme, and the trial court did hold separate hearings for the abused and neglected determination and the termination decision, we find no merit in father's third assignment of error.

### C. Assignment of Error 4:  Refusal of services to parents prior to termination

Father assigns as error the trial court's refusal to require the Department to provide him and mother with further rehabilitative services prior to terminating their parental rights.  Father claims that this denial is in violation of Code § 16.1-283(B)(2) and our decision in Todd v. Copeland, 55 Va. App. 773, 689 S.E.2d 784 (2010), aff'd in part, rev'd in part, 282 Va. 183, 715 S.E.2d 11 (2011).[7]  Neither of these authorities, however, requires a trial court to order the Department or another entity to provide rehabilitative services prior to terminating a parent's rights.  Code § 16.1-283(B)(2) merely requires the trial court to "take into consideration the efforts made to rehabilitate the parent or parents by any public or private social, medical, mental health or other rehabilitative agencies prior to the child's initial placement in foster care."  We have previously confirmed that this provision does not require that the Department or other entity offer any services to a parent before requesting termination of the parent's rights.  Toms, 46 Va. App. at 268, 616 S.E.2d at 771 (stating that "[n]othing in Code § 16.1-283 or the larger statutory scheme requires that such services be provided in all cases as a prerequisite to termination under subsection B").

---

[7] Assignment of Error 4 states:  "The trial court erred in permitting the Department to proceed to termination of parental rights while simultaneously refusing all services to the parents, in violation of Code § 16.1-283(B)(2) and of Todd v. Copeland, 55 Va. App. 773, 689 S.E.2d 784 (2010)."

The trial court explicitly stated in each of its final termination orders, "In making this determination, the court takes into consideration the efforts made to rehabilitate the parents by public and private social, medical, mental health and other rehabilitative agencies prior to [E., W., and A.'s] initial placement in foster care." It therefore made the requisite finding under Code § 16.1-283(B)(2). In declining to order more services for father to remedy the conditions, the trial court had ample evidence in the record to rely on, including Ms. Trabosh's testimony as to why the Department did not create a plan for services.

Father cites to statements from our decision in Todd in support of his argument, but, even putting aside the effect of the Supreme Court's partial reversal of that decision, father's argument takes the analysis in Todd out of context. On brief, father quotes from this Court's decision in Todd, arguing: "Courts resort to the termination of parental rights in these situations only when the parents have exhibited, in the face of assistance from social services over an extended period of time . . . a complete inability to successfully parent one's child." Todd, 55 Va. App. at 795, 689 S.E.2d at 795. This language in Todd refers to terminations proceeding under Code § 16.1-283(C), not Code § 16.1-283(B). As we have previously held, there is an important distinction between these two subsections. Subsection (C) cases require provision of rehabilitative services before termination because they do not begin with a prior finding of abuse or neglect; whereas subsection (B) cases start with the abused or neglected finding and require the trial court to make a judgment about a child's best interest based on that finding. See Toms, 46 Va. App. at 269, 616 S.E.2d at 771 (explaining the difference between subsections (B) and (C) and concluding, "[s]ubsection B does not create specific time frames, nor does it mandate that a public or private agency provide any services to a parent after the child enters foster care" (internal quotations and citation omitted)).

- 26 -

Because the trial court took the rehabilitative services into consideration and did not err in refusing to order the Department to provide any additional services, we find no merit in this assignment of error.

D. Assignments of Error 5 and 6: Detriment to the child and irremediable defects

Father argues in his fifth and sixth assignments of error that the trial court could not legally terminate his rights to his children without making two particular findings by clear and convincing evidence. In his fifth assignment of error, father contends that the trial court needed to find that the maintenance of any relationship between father and the child would be a detriment to that child.[8] Similarly, in his sixth assignment of error, father argues that the trial court needed to find that father's defects as a parent were irremediable before terminating his parental rights to the children.[9] Father again cites to our decision in Todd for these propositions. Since once again, these assignments of error both raise questions of law, we review them under a *de novo* standard. See Wilson, 58 Va. App. at 519, 711 S.E.2d at 254.

---

[8] Assignment of Error 5 states:

> The trial court erred in not requiring in the case of each child proof by clear and convincing evidence with respect to termination of parental rights that the maintenance of any relationship between [father] and that child would be a detriment to that child, independent of the best interests test.

[9] Assignment of Error 6 states:

> The trial court erred in not requiring that the Department prove that the defects of [father] as a parent are irremediable, as required in Todd v. Copeland. While [father] argues that the clear and convincing evidence test is the proper standard, [father] argues in the alternative that not even the preponderance of the evidence test was met by the Department.

The Supreme Court's decision in <u>Copeland</u> particularly addresses father's arguments regarding the need to prove detriment to the child in a termination case.[10]

> Inclusion of the precise language of "detriment" is not necessary for these [adoption] statutes to pass constitutional muster. *The phrase "detriment to the child" is no term of art or requisite mantra.* Rather for these [adoption] statutes to pass constitutional due process scrutiny, *they must provide for consideration of parental fitness and detriment to the child.* The Virginia statutory scheme does so.

<u>Copeland</u>, 282 Va. at 199, 715 S.E.2d at 20 (emphasis added).

Thus under <u>Copeland</u>, the Fourteenth Amendment's Due Process Clause simply requires that a statute allowing a court to permanently sever the relationship between a biological parent and his child must "provide for *consideration* of parental fitness and detriment to the child" but need not explicitly use those terms. <u>See</u> <u>id.</u> (emphasis added). Code § 16.1-283(B) meets this standard by requiring the trial court to consider implicitly both parental fitness and detriment to the child. Before a trial court may terminate residual parental rights under subsection (B), the trial court must find that the abuse or neglect the child suffered "presents a serious and substantial threat to the child's health, life or development," thereby considering the detriment to the child. Code § 16.1-283(B)(1). The trial court must also conclude that the parent is unlikely to be able to substantially remedy or eliminate the conditions that led to the neglect or abuse within a reasonable period of time to allow the child's safe return to his care. Code § 16.1-283(B)(2). Consequently, the trial court must consider the parent's ability and thereby, the parent's fitness, but also must consider the detriment to the child in waiting for the parent to be able to remedy the conditions that resulted in the neglect or abuse. <u>See</u> <u>Kaywood v. Halifax Cnty. Dep't of Soc. Servs.</u>, 10 Va. App. 535, 540, 394 S.E.2d 492, 495 (1990) (holding that it is

---

[10] Although decided in the context of the Commonwealth's adoption statutes, the principle is equally applicable in this case.

- 28 -

not in a child's best interest to wait a significant period of time to "find out when, or even if, a parent will be capable of resuming his responsibilities"). Accordingly, we find that Code § 16.1-283(B) comports with the Supreme Court's most recent enunciation of constitutional requirements even though it does not require the trial court to make an explicit finding regarding detriment to the child.

Father further argues that the trial court erred in not finding that his defects as a parent were irremediable. He asserts that our decision in Todd requires the trial court to make this finding. However, again, father takes certain language from that decision out of context. He points to the following statement from Todd: "Instead, the *unfitness must be so severe and so incapable of remedy* that 'the continuance of the relationship' between the biological parent and the child would be 'detrimental to the child's welfare.'" Todd, 55 Va. App. at 787, 689 S.E.2d at 791 (emphasis added) (quoting Hickman v. Futty, 25 Va. App. 420, 428, 489 S.E.2d 232, 236 (1997)). We advanced this statement in describing the detriment to the child requirement and did not conclude that a trial court needed to make a finding of "irremediable defects" prior to allowing adoption over a biological parent's consent. Furthermore, that statement was included in the portion of our opinion that the Supreme Court later reversed, thereby eliminating any precedential effect it may have otherwise had. Copeland, 282 Va. at 202, 715 S.E.2d at 20.

It is well settled that it is not in a child's best interest to wait a significant period of time to "find out when, or even if, a parent will be capable of resuming his responsibilities." Kaywood, 10 Va. App. at 540, 394 S.E.2d at 495. Consistent with Kaywood, Code § 16.1-283(B) requires the trial court to find only that father was unlikely to substantially remedy or eliminate the conditions that led to the abuse or neglect within a reasonable period of time. The statute recognizes that a child is already in danger by virtue of the abused or neglected finding and requires the trial court to make a prospective determination about a parent's ability to

rehabilitate himself in a reasonable period of time so as to allow the child to return to a safe environment. See Newport News Dept. of Soc. Servs. v. Winslow, 40 Va. App. 556, 562-63, 580 S.E.2d 463, 466 (2003). The trial court made the requisite findings, and we decline father's invitation to add requirements to the statute that the Supreme Court has indicated are not necessary.

### E. Assignment of Error 7: Motion to vacate for fraud on the court

Father contends that the trial court erred in denying his motion to vacate its final termination orders for fraud on the court.[11] Yet, father did not note an appeal to the trial court's order denying his motion.[12] Rule 5A:6 makes the timely filing of a notice of appeal to this Court mandatory and jurisdictional. See Woody v. Commonwealth, 53 Va. App. 188, 196, 670 S.E.2d 39, 43 (2008). This Court has interpreted these timeliness provisions strictly, finding compliance with them "'necessary for the orderly, fair and expeditious administration of justice.'" Mayo v. Dep't of Commerce, 4 Va. App. 520, 522, 358 S.E.2d 759, 761 (1987) (quoting Condrey v. Childress, 203 Va. 755, 757, 127 S.E.2d 150, 152 (1962)). Because the record indicates that father failed to timely note an appeal of the trial court's order denying the motion to vacate, we have no jurisdiction to consider this assignment of error.

### F. Assignment of Error 8: Violation of Code § 16.1-283(E)

In his eighth assignment of error, father argues that the trial court violated Code § 16.1-283(E) to the extent that it relied on the alleged abuse of A. to justify terminating father's

---

[11] Assignment of Error 7 states: "The trial court erred in refusing to consider the parents' motions to set aside the verdict on the basis that the trial court lacked subject matter jurisdiction to entertain the motion."

[12] The trial court denied the motion because it did not have subject matter jurisdiction as the case was on appeal to this Court.

- 30 -

rights to E. and W.  Father argues that Code § 16.1-283(E) allows reliance only upon a prior termination of the parent's rights to a sibling, and not upon a simultaneous termination.[13]

In his objections to the final termination order for A., father states:  "This case was tried, correctly or erroneously as the case may be, under . . . Code § 16.1-283(B), rather than § 16.1-283(E)."  "A litigant is estopped from taking a position which is inconsistent with one previously assumed, either in the course of litigation for the same cause of action . . . ."  Burch v. Grace St. Bldg. Corp., 168 Va. 329, 340, 191 S.E. 672, 677 (1937).  See also Hurley v. Bennett, 163 Va. 241, 252, 176 S.E. 171, 175 (1934) (holding that a litigant may not "approbate" and "reprobate").  Based on his assertion at trial that Code § 16.1-283(E) was not the basis for termination of his parental rights, father is estopped from now claiming on appeal that the trial court erroneously terminated his parental rights under Code § 16.1-283(E).  Consequently, we decline to consider the merits of this assignment of error.

G.  Assignments of Error 9 and 10:  Abuse or neglect of E. and W.

In assignments of error nine and ten, father challenges the trial court's decision to terminate his parental rights to E. and W. on multiple grounds.  In assignment of error nine, he contends that the trial court erred in terminating his rights to E. and W. because it only found them to be "at risk" of abuse or neglect and Code § 16.1-283(B) requires a finding that they were

---

[13] Assignment of Error 8 states:

> To the extent that the trial court relied on the alleged abuse of [A.] as evidence for the termination of [father's] rights to [W.] and [E.], the trial court violated Code § 16.1-283(E), in that the statute only allows reliance on a prior termination as to a sibling, not a simultaneous termination as attempted in this case.  Code § 16.1-283(B) should be read consistently with subsection (E).

actually abused or neglected. In assignment of error ten, father challenges the sufficiency of the evidence supporting the trial court's decision to terminate his rights to E. and W.[14]

Father's first argument seems to conjoin the trial court's determination at the end of the abused or neglected trial and its findings in the final termination orders. Assignment of error nine states: "The trial court erred in terminating parental rights with respect to [W.] and [E.] because they were only at risk of abuse and neglect, whereas Code § 16.1-283(B) requires that a child actually be abused before parental rights can be terminated." It cannot be determined with certainty where the "at risk" language that father advances emanates from, but in the event that he is identifying error in the trial court's abused or neglected determination that E. and W. were "in danger of death, disfigurement, or impairment of bodily or mental functions," we will first analyze that determination and then examine the final termination orders for error.

In its December 1, 2009 memorandum opinion, the trial court stated:

> I find that [E.] and [W.] *are in danger of death, disfigurement or impairment of bodily or mental functions at the hands of their parents* by reason of the abuse and neglect of their sibling, [A.] This latter form of abuse or neglect is recognized by statute. I refer to . . . Code § 16.1-278.2(A). *Hence, I find that they are abused and/or neglected under the definition set forth in . . . Code § 16.1-228(1).* In making this determination, I also have in mind the history of these parents which includes a previous removal of these children from their home.

(Emphasis added).

---

[14] Assignment of Error 10 states:

> Regardless of the standard applied and regardless of the correctness of the trial court's finding as to [A.], the trial court erred in finding that [father] had created a risk that [E.] or [W.] would be abused and neglected, where the Department had no evidence other than a missed medical appointment that he had done anything wrong to either or both of them. Therefore, it was error both as to fact and law to remove [E.] and [W.] or either of them from their parents where the claimed abusive acts by [father] were directed exclusively at [A.] to the extent that they occurred at all.

- 32 -

Code § 16.1-228 defines the terms used in the juvenile and domestic relations district courts.  In pertinent part, it states:

> When used in this chapter, unless the context otherwise requires:
>
> *"Abused or neglected child"* means any child:
>
>> Whose parents or other person responsible for his care creates or inflicts, threatens to create or inflict, or allows to be created or inflicted upon such child a physical or mental injury by other than accidental means, or creates a substantial risk of death, disfigurement or impairment of bodily or mental functions . . . .

Code § 16.1-228(1).

The trial court found E. and W. to be "in danger of death, disfigurement or impairment of bodily or mental functions at the hands of their parents" and thereby adjudicated them as abused or neglected.  This Court has previously upheld an adjudication of a newborn child abused or neglected, before the child ever left the hospital with her biological mother, based, in part, on previous findings of abuse or neglect of the mother's three other children.  See Jenkins, 12 Va. App. at 1183, 409 S.E.2d at 19 (affirming the trial court's abused or neglected finding based on previous findings of abuse or neglect of mother's three other children and history with the court).[15]  In Jenkins, we discussed the language of Code 16.1-228(1) and held:

> [T]he statutory definitions of an abused or neglected child do not require proof of actual harm or impairment having been experienced by the child.  The term "substantial risk" speaks *in futuro* . . . .
>
> Accordingly, we hold that the Code contemplates intervention in such circumstances by allowing for the emergency removal of children before placement into an environment where "the child would be subjected to an imminent threat to life or health to the extent that severe or irreversible injury would be

---

[15] We note that the portion of Jenkins mentioned is especially applicable to this assignment of error because it addresses only the trial court's abused or neglected determination.  Similarly, we limit this portion of our opinion to the trial court's abused or neglected determination before moving to its subsequent termination decision.

- 33 -

likely to result if the child were returned to or left in the custody of his parent . . . ."  Code § 16.1-251(A)(1).

Jenkins, 12 Va. App. at 1183, 409 S.E.2d at 19.  As in Jenkins, the trial court based its decision in this case not only on the parents' treatment of A. but also on the parents' history, including a prior removal of the children from their home.  The trial court adjudicated E. and W. to be "neglected or abused" as Code § 16.1-228(1) defines that term and proceeded to termination as permissible under the portion of Code § 16.1-283(B) that father cites, for "a child found by the court to be neglected or abused . . . ."  Thus we find no error in the trial court's determination about the abuse or neglect of E. and W. nor its decision to proceed to termination on that basis.

Specific to termination, father's argument also ignores the plain language of the trial court's final termination orders for E. and W., which stated:

> The Court further finds . . . by clear and convincing evidence, that:
>
> \*       \*       \*       \*       \*       \*       \*
>
> [E. and W. are] in danger of death, disfigurement or impairment of bodily or mental functions at the hands of her parents by reason of the abuse and neglect of [her/his] sibling, [A.].  This latter form of abuse or neglect is recognized by statute.  I refer to . . . Code § 16.1-278.2(A).  Hence, I find that [she/he] is abused and/or neglected under the definition set forth in . . . Code § 16.l-228(1).

Again, contrary to father's argument, the trial court did not find E. and W. merely "at risk" of abuse or neglect.  The trial court found the children abused and/or neglected as that term is defined in Code § 16.1-228(1), even tracking the precise language of the statutory definition, finding that the children were "in danger of death, disfigurement or impairment of bodily or mental functions."

Father implicitly argues that the trial court erred because Code § 16.1-283(B)(1) requires a showing that "The neglect or abuse *suffered by* such child presented a serious and substantial threat to his life, health or development."  (Emphasis added).  We address this contention as

- 34 -

merely a challenge to the sufficiency of the evidence and accordingly are duty-bound to affirm the trial court's determination unless it was plainly wrong or without supporting evidence. See Toms, 46 Va. App. at 266, 616 S.E.2d at 769. Moreover, in the analytical process, we view the evidence in the light most favorable to the Department because it was the prevailing party below. Jenkins, 12 Va. App. at 1180, 409 S.E.2d at 17.

Father characterizes the sum of the evidence about his neglect or abuse of E. and W. as "a missed medical appointment."[16] He also concedes that even assuming *arguendo* that A. was abused, the record contains no evidence of any animus between father and E. and W.

The trial court cited substance abuse and the history of the prior removal in its final order. That evidence, in addition to other evidence in the record, supports the conclusion that father neglected E. and W. For example, father admitted at trial that he knew mother was using marijuana during her pregnancy with E. yet did nothing to stop her. Father also testified that he did not know mother was using cocaine during her pregnancy with W. and A., but then stated that he removed her from the person who sold her the cocaine by telling the person that she was pregnant. Father also admitted that he smoked marijuana in May 2008, after the Department removed the children the second time. Thus, father used illegal drugs again despite the Department's provision of substance abuse counseling during the first removal.

Dr. Lewis testified extensively about father's history with the Department starting with the first removal in 2007. He testified that father's problems with alcohol abuse began when he was a teenager. Dr. Lewis noted that father suffered from alcohol dependence, a history of polysubstance abuse, along with a narcissistic personality disorder with antisocial traits.

---

[16] We note for the record that the evidence about a missed medical appointment related to A., not E. or W.

Dr. Lewis found considerable problems with father's parenting skills, specifically because he did not adequately understand children's developmental stages nor his own strengths and weaknesses. By way of example, Dr. Lewis noted that father thought "growling" at the children was an appropriate disciplinary tool.

When comparing father's evaluation from 2007 to the most recent evaluation in 2009, Dr. Lewis testified that father's parenting capacity had increased but that he still had significant work to do before he could be considered a minimally adequate parent. When Dr. Lewis asked father about whether he would go back and do anything differently prior to the most recent removal, father could not think of anything except that he would have taken the children to the doctor instead of letting mother do it and would have told the Department, "No, you're not taking my kids."

Most relevant to E. and W., however, Dr. Lewis testified that father's presence was harmful to the children and placed them at risk. When pressed about why exactly father posed a danger, Dr. Lewis stated that father was unable to simply have a few drinks but regularly consumed alcohol to the point that he engaged in behaviors that were dangerous and inappropriate related to his parenting abilities. Additionally, Dr. Lewis testified that the combination of the following makes father a danger to the children:

1. The longstanding pattern and history of his substance abuse and his inability to control it;

2. The pattern and history of physical violence between father and mother;

3. The personality disorder that causes him to not be able to see his own faults, weaknesses and problems, but to blame them on others;

4. His limited parenting ability, particularly with emotionally and behaviorally disturbed children;

5. The fact that A. was injured, or something happened to A., while in father's care; and

6. That the trial court later determined father was at fault for A's injuries.

Dr. Lewis further testified that returning the children to the home with both parents living together would be dangerous.

The trial court based its finding that E. and W. were actually neglected on father's continued substance abuse and history with the Department and the court, and we cannot say that this approach was plainly wrong. See Butler v. Culpeper Cnty. Dep't of Soc. Servs., 48 Va. App. 537, 550, 633 S.E.2d 196, 202 (2006) (relying on a mother's continued drug use to support terminating her parental rights under Code § 16.1-283(B)). Because evidence in the record supports the trial court's decision and it is not plainly wrong, we affirm the trial court's finding that father abused or neglected E. and W. and that the abuse or neglect presented a serious and substantial threat to their lives, health, and development.

H. Assignments of Error 11, 12, and 13: Sufficiency of the evidence – abuse and neglect of A.

Father's assignments of error eleven through thirteen challenge the sufficiency of the evidence supporting certain findings that the trial court made regarding A. First, in assignment of error eleven, father argues that the trial court had insufficient evidence to find that father, or mother with father's knowledge and consent, abused A. Second, father contends in assignment of error twelve that the trial court had insufficient evidence to find that any human being intentionally inflicted A.'s injuries. Third, to the extent that the evidence proved father neglected A., he claims that evidence was insufficient to justify terminating father's parental rights, let alone even removing A. from the home.[17]

---

[17] Assignment of Error 13 states: "Regardless of the standard applied, to the extent that there was proved any neglect of [A.] by [father], such neglect was insufficient as a matter of law to justify terminating his parental rights or even to justify removing [A.] from the home."

On review of a trial court's decision to terminate parental rights we view the evidence in the light most favorable to the prevailing party, in this case, the Department, and grant to it all reasonable inferences fairly deducible from the evidence.  See Toms, 46 Va. App. at 262, 616 S.E.2d at 767.  When the trial court acts as a factfinder, as it did in this case, it retains "broad discretion in making the decisions necessary to guard and to foster a child's best interests." Farley, 9 Va. App. at 328, 387 S.E.2d at 795.  We do not hesitate to reiterate that a trial court's paramount consideration in a termination case is the best interests of the children.  See Logan, 13 Va. App. at 128, 409 S.E.2d at 463.

1. Father's abuse of A. and the intentional infliction of A.'s injuries

At the end of the abused or neglected trial, the trial court concluded on the record, and in its December 1, 2009 memorandum opinion that father abused A.  The memorandum opinion stated:  "I found that [A.] to have been abused [sic] and neglected by his father and to have been neglected by his mother."  At the conclusion of the abuse or neglect proceeding, the trial court stated:

> Well, it's clear to me that [A.] was abused and neglected.  The types of injuries that he sustained are not injuries that you get in routine play, falls around the house.  *It takes a great violence to inflict that type of injury, bilateral subdural hematoma, bilateral retinal hemorrhages, which were diffuse.  These are a result of, again, great violence.*
>
> Of course, the additional disturbing thing with respect to the subdural hematomas is that *they were of various ages*, which would indicate that he perhaps suffered the same type of abuse in the past.  *No explanation has been offered by the person in whose care he was at the time as to how this happened.*
>
> *I have no hesitation in finding [father] abused [A.] and inflicted these injuries,* given the evidence that I have heard.  *His credibility has suffered in this courtroom* because of the contradictions and inconsistencies in his testimony and the contradictions between the testimony of the two parents.  I also find from his testimony that *there is some animus towards [A.]; he's selfish; he's an attention-getter; he's difficult; he throws*

> *temper tantrums, and all this stuff, almost as if shifting the blame to [A.] for this whole episode.*

(Emphasis added).

The trial court, therefore, based its finding that father abused A. on the medical evidence, father's own conflicting testimony and demeanor, and the contradictions between father's and mother's testimony. Specific to the medical evidence, Dr. Scherrer testified that A.'s brain injuries – bilateral subdural hematomas of differing ages and bilateral retinal hemorrhages – were most consistent with "non-accidental trauma." Dr. Scherrer based this determination on the lack of history to explain the injuries and ruled out the possibility that the parents' explanations – blow to the head with a toy truck or hitting head on coffee table – could have caused the injuries. Dr. Dunn also came to the same conclusion about the cause of A.'s injuries based on the same information.

Father misconstrues the testimony of Drs. Jane and Richards by stating that they refused to opine that A.'s injuries resulted from abuse. Dr. Richards, A.'s treating ophthalmologist, stated that he did not have enough information about A.'s history and other medical information to make a determination about the cause of the bilateral retinal hemorrhages. Similarly, Dr. Jane, A.'s treating neurosurgeon, stated that he did not have an opinion to a reasonable degree of medical certainty about the cause of A.'s subdural hematomas because he was consulted only to determine whether A. needed surgery.

The evidence was undisputed that father was A.'s caretaker each time he had a "seizure" and needed medical attention. The trial court was in the unique position to observe father's demeanor on the witness stand and ultimately determined that he lacked credibility. See King v. Int'l Harvester Co., 212 Va. 78, 84, 181 S.E.2d 656, 660 (1971) (according great weight to the trial court's findings of fact because it is in a better position than an appellate court to observe a witness' "demeanor, appearance, candor and behavior on the witness stand"). We are not

- 39 -

permitted to conduct a trial *de novo* on appeal to second guess a trial court's credibility determination. Both parents offered various explanations for A.'s injuries during their testimony, and the trial court explicitly rejected these explanations in its final termination orders for each child. The record supports the trial court's conclusion about father's attitude toward A., and the statements the trial court quoted came directly from father's testimony. The record further supports the trial court's conclusion about conflicts between father's testimony and mother's testimony. Consequently, we find that the evidence was sufficient for the trial court to conclude that father abused A. and intentionally inflicted A.'s injuries.

### 2. Father's neglect of A.

Father asserts that to the extent the Department proved he neglected A., that neglect was insufficient as a matter of law to justify terminating his parental rights to A. or even to justify removing A. from the home. Particular to the neglect inquiry, as opposed to abuse, the trial court stated on the record at the conclusion of the abuse and neglect trial:

> As far as neglect, I think both parents are guilty of neglect. It went far too long between doctor visits when [A.] was a malnourished child, I mean, 16 pounds at 18 months of age. So there's no question that [A.] is abused and neglected, abused and neglected by his father and neglected by his mother.

In both the December 1, 2009 memorandum opinion and the final termination order for A., the trial court noted that it considered the case in the context of it being the second removal of the children. In the final termination order for A., the trial court further intimated that it also based its decision on the parents' continued problems with substance abuse. As discussed above, the trial court had ample evidence about father's substance abuse and lack of progress between the first and second removal to determine that father neglected A.

We find no error in the trial court's decision to rely on the same evidence for all three children. The record indicates that father was regularly the sole caretaker of all three children,

and it was during these times when A. suffered grievous injuries. Even if we assume father's explanations about A.'s injuries were true, the trial court could have concluded that father neglected A. in failing to seek medical attention for him after he allegedly fell down the stairs and was unconscious. Additionally, father is equally as culpable as mother for failing to ensure that A.'s malnourishment issues were addressed in a reasonable period of time instead of waiting until A. was violently ill. Accordingly, we find no merit in these assignments of error.

## I. Assignment of Error 14: Returning E. and W. home

Father's fourteenth assignment of error states: "The trial court erred in finding under any standard of proof that there were no circumstances under which any one or more of the children could within a reasonable time be returned to [father's] home." Under this assignment of error, father challenges both the legal standard the trial court applied and the evidence supporting the trial court's decision to terminate his rights to E. and W. under the second prong of Code § 16.1-283(B).

Initially, we recognize that the appropriate legal standard for addressing a question of law is *de novo*. Wilson, 58 Va. App. at 519, 711 S.E.2d at 254. Next, when addressing the sufficiency argument, we are compelled to view the evidence in the light most favorable to the Department as the prevailing party below. Jenkins, 12 Va. App. at 1180, 409 S.E.2d at 17.

Father contends that our decision in Todd required the trial court to find that there were no circumstances under which one or more of the children could be returned to father's home before terminating his parental rights. While recognizing the Supreme Court's partial reversal of this Court's decision in Todd on other grounds, we find that this did not effect any change to the termination statutes analyzed in Todd. Thus, we reconfirm our holding in Todd in this regard where we explicitly affirmed the constitutionality of Code § 16.1-283(B), stating:

> Finally, we note that this conclusion [that the detriment to
> the child standard exists independent of the Code] is consistent

- 41 -

> with the Code's treatment of children who are in the care of social services . . . . Code § 16.1-283, which governs the termination of residual parental rights of parents whose children have been placed in foster care, requires more than a finding that the termination will be in the best interest of the child. Instead, the statute sets forth several other required findings *in addition* to a determination that the termination would be in the child's best interests in order to justify a termination of parental rights. See Code § 16.1-283(B).

Todd, 55 Va. App. at 790 n.8, 689 S.E.2d at 792 n.8.

We again decline father's invitation to fault the trial court for failing to make findings that our statutes do not require. The trial court was required to find under Code § 16.1-283(B)(2) that father was not reasonably likely to substantially remedy or eliminate the conditions resulting in the neglect or abuse within a reasonable period of time so as to allow the children to safely return to his care, and nothing more. In addition to the evidence we have already reviewed about father's relationship with the children, Virginia's jurisprudence recognizes that "past actions and relationships over a meaningful period serve as good indicators of what the future may be expected to hold." Winfield v. Urquhart, 25 Va. App. 688, 695-96, 492 S.E.2d 464, 467 (1997). The record indicates that the court removed the children the first time because of the parents' substance abuse, and, despite the parents' receiving substance abuse and individual counseling over the course of six months, the court had to remove the children again for arguably more severe issues, including A.'s brain injuries. The trial court specifically noted the severity of these injuries, finding in its final termination order for A. that the injuries father inflicted constituted "'aggravated circumstances' as defined by Code [§ ]16.1-283."

Moreover, Dr. Lewis's evaluation following the removal indicated that father had not resolved his substance abuse issues and had serious deficiencies as a parent, despite the services he received after the first removal. As noted above, Dr. Lewis was clear about why father is a danger to the children and how his presence is harmful and puts the children at risk. Hence, we

- 42 -

find that the record contained sufficient evidence to support the trial court's conclusion under Code § 16.1-283(B)(2).

Father again raises arguments about Code § 16.1-283(E) under this assignment of error, and consistent with our analysis above, we conclude that he is estopped from raising them. Therefore, we find no merit in this assignment of error.

J. Assignment of Error 16: Evidence of mother's failure to obtain prenatal care

Father contends that the trial court erred in permitting the Department to introduce evidence that mother failed to obtain prenatal care.[18] He challenges this decision on two grounds: first, that Roe v. Wade, 410 U.S. 113 (1973), gives mother a privacy right in her decision to not obtain prenatal care, and second, that res judicata barred the introduction of this evidence. Because both issues raise a question of law, we review them *de novo*. See Rusty's Welding Serv. v. Gibson, 29 Va. App. 119, 127-28, 510 S.E.2d 255, 259 (1999) (holding that res judicata is a question of law reviewed *de novo* on appeal); see also Hancock-Underwood v. Knight, 277 Va. 127, 131, 670 S.E.2d 720, 722 (2009) (confirming that whether a privilege applies is a question of law).

Father contends that the United State Supreme Court's decision in Roe recognizes a woman's right to privacy in her decision to terminate her pregnancy and can also be interpreted to bar the introduction of evidence of a woman's failure to obtain prenatal care under any circumstances. We disagree. As Roe itself demonstrates, and the trial court correctly concluded, the holding in Roe does not extend to that degree. Incidentally, the United States Court of Appeals for the Fourth Circuit applied Roe in a case involving interpretation of Virginia law, stating:

---

[18] Assignment of Error 16 states: "The trial court erred in admitting over [father's] objection evidence that [mother] had not sought prenatal care before the births of any of the children involved in this case."

> [I]n Roe v. Wade, 410 U.S. 113, 35 L. Ed. 2d 147, 93 S. Ct.
> 705 (1973), and Doe v. Bolton, 410 U.S. 179, 35 L. Ed. 2d 201,
> 93 S. Ct. 739 (1973), the Court recognized a related right of
> privacy -- the right of a woman to terminate a pregnancy by an
> abortion, unqualified to the end of the first trimester of
> pregnancy and *qualified thereafter by proper state regulation
> to preserve the state's interest in the preservation and
> protection of maternal health and preservation of the life of a
> viable fetus.*

Lovisi v. Slayton, 539 F.2d 349, 353-54 (4th Cir. 1976) (emphasis added).

The Court continued: "The 'right of privacy,' apt in some cases, is a misleading misnomer in others including this one. This freedom may be termed more accurately 'the right to be let alone,' or personal autonomy, or simply 'personhood.'" Id. at 356. Implicit in this construction is the conclusion that while Roe may protect a woman from certain state regulations regarding abortion and prenatal care, it has nothing to do with the admissibility of evidence. It is inapplicable in cases such as this one when the state is simply preserving and protecting "maternal health and preservation of the life of" children who have moved past the "viable fetus" stage and are now living and growing. Simply put, nothing in the holding of Roe prohibits a trial court from considering a mother's refusal to seek prenatal care in determining whether that child, once born, is at risk of abuse or neglect.

Father also claims that res judicata bars the evidence of mother's failure to obtain prenatal care for the three children in the case at bar because the same issue was before the trial court in the prior removal action, and a final judgment was entered in favor of the parents.[19]

In actions commenced after July 1, 2006, Rule 1:6 governs claims of res judicata, stating in pertinent part:

---

[19] Father additionally contends that this evidence was inadmissible because the Department's case had to rest on actions or omissions after the date of the first final judgment returning the children to the parents' custody on October 12, 2007. Because we find that this argument is encompassed in the res judicata argument addressed in this section, we decline to analyze it separately.

> A party whose claim for relief *arising from identified conduct, a transaction, or an occurrence*, is decided on the merits by a final judgment, shall be forever barred from prosecuting any second or subsequent civil action against the same opposing party or parties on any claim or cause of action *that arises from that same conduct, transaction or occurrence . . . .*

(Emphasis added).

The claim for relief in the case at bar does not arise from the "same conduct, transaction or occurrence." Id. In the first case, the Department removed the children after W. and A.'s birth because they were born with cocaine in their systems, and E. was born exposed to marijuana one year earlier. Whereas, in the second case, the Department removed the children and petitioned for termination after A. suffered from severe brain injuries that the trial court determined father inflicted. Because the doctrine of res judicata does not apply, we find no error in the trial court's decision to consider evidence of mother's failure to obtain prenatal care.

Therefore, we find no merit in either of father's arguments under this assignment of error.

### K. Assignment of Error 17:
Evidence of mother's illegal drug use during her pregnancy with W. and A.

Under this assignment of error, father raises the same argument regarding res judicata as he raised in the previous assignment of error about mother's failure to obtain prenatal care.[20] We find no merit in this assignment of error for the same reasons as stated above.

---

[20] Assignment of Error 17 states:

> The trial court erred in admitting over [father's] objection evidence of [mother's] use of illegal drugs during the pregnancy of [W.] and [A.] when abuse proceedings were terminated by a complete and unqualified return of these children to their parental home because it was in the children's best interest to so do.

L.  Assignment of Error 18:  Dr. Scherrer's opinion about the cause of A.'s injuries

Father argues that the trial court erred in admitting Dr. Scherrer's opinion because it was not expressed to "sufficient medical certainty" to qualify for admission as an expert opinion.[21] The decision whether to admit expert testimony rests within the sound discretion of the trial judge, and therefore we will not reverse unless the trial court abused its discretion.  Riverside Owner, L.L.C. v. Richmond, 282 Va. 62, 73, 711 S.E.2d 533, 539 (2011).  Expert testimony "is admissible in civil cases to assist the trier of fact, if the testimony meets certain fundamental requirements, including the requirement that it be based on an adequate factual foundation." Countryside Corp. v. Taylor, 263 Va. 549, 553, 561 S.E.2d 680, 682 (2002); see also Code §§ 8.01-401.1 and -401.3.  Expert testimony is thus "inadmissible if it is speculative or founded on assumptions that have an insufficient factual basis."  John v. Im, 263 Va. 315, 320, 559 S.E.2d 694, 696 (2002).  Additionally, "expert testimony is inadmissible if the expert fails to consider all the variables that bear upon the inferences to be deduced from the facts observed." Vasquez v. Mabini, 269 Va. 155, 160, 606 S.E.2d 809, 811 (2005).

When the physical condition of a patient is at issue in a civil action, the diagnoses of medical experts about that condition must be expressed to a reasonable degree of medical probability or they are inadmissible.  Code § 8.01-399(B).  Any testimony about a diagnosis that a medical expert admits is not competent to a reasonable degree of medical certainty is inadmissible and speculative.  See Pettus v. Gottfried, 269 Va. 69, 78, 606 S.E.2d 819, 825 (2005).  Virginia law draws a critical distinction between statements by experts that are opinions in the form of medical diagnoses and mere factual impressions based on treating the patient at

---

[21] Assignment of Error 18 states:  "The trial court erred in admitting over [father's] objection the opinion of Dr. Scherrer concerning the issue of whether [A.] was abused because that opinion was not expressed to sufficient medical certainty to qualify for admission into evidence as an expert opinion."

issue.  Graham v. Cook, 278 Va. 233, 244, 682 S.E.2d 535, 541 (2009).  Expert testimony that communicates a medical diagnosis must be stated to a reasonable degree of medical probability. Id. (citing Code § 8.01-399(B)).  Expert testimony conveying impressions that are "factual in nature," however, need not be stated to that same degree.  Id.

During the Department's questioning of Dr. Scherrer during her *de bene esse* deposition, the following exchanges took place:

> Q:  What was to a reasonable degree of medical certainty, what was [A.'s] medical condition?
>
> A:  He had extensive bilateral retinal and pre-retinal hemorrhages, and old and new subdural hematomas.
>
> Q:  And what else?
>
> A:  The clinical diagnosis based on those findings, as well as the lack of history to explain it, again, were most consistent with non-accidental trauma.
>
>       *       *       *       *       *       *       *
>
> Q:  You've stated that the history provided to you as to the injuries would not have been sufficient to cause this degree of damage.  Is this your opinion to a reasonable degree of medical certainty?
>
> A:  Yes, it is.
>
> Q:  Would you please explain this opinion?
>
> A:  The history that we were provided, which included a previous fall that [A.] experienced, I believe, in the middle of March where he hit his head upon the coffee table, and then he had been hit in the head three days prior to being admitted this time by a toy truck, were not sufficient to cause bilateral significant retinal hemorrhages, nor the old and new subdural hematomas in the absence of a significant bleeding disorder, or the absence of some other very significant trauma.
>
>       *       *       *       *       *       *       *
>
> Q:  Subject to the objection, in your opinion, to a reasonable degree of medical certainty, could a fall down the stairs have caused the retinal hemorrhages?

A: No, it could not have.

\* \* \* \* \* \* \*

Q: Are the medical opinions which you offered during this deposition true to a medical degree of – or true to a reasonable degree of medical certainty?

A: Yes.

Regardless of whether we hold that Dr. Scherrer's statement about the cause of A.'s injuries was a medical diagnosis or a factual impression based on her treatment of him, she stated that it was her opinion to a reasonable degree of medical certainty. In coming to this conclusion Dr. Scherrer asserted that she relied on facts, data, and opinions commonly relied upon by experts in her field, and specifically identified those items in her deposition. She stated, in not so many words, that because she had no other explanation from A.'s history about the injuries and no outward signs of trauma, she could not come to any conclusion other than that they were caused by non-accidental trauma. Despite mother's concealment of A.'s fall down the stairs, Dr. Scherrer addressed it and stated that it could not have caused the retinal hemorrhages.

Dr. Scherrer's opinion about the cause of A.'s injuries was based on the history provided to her and the treating teams' findings from their examination of A., not speculation. Therefore, we find that the trial court did not abuse its discretion in accepting her expert opinion about the cause of A.'s injuries.

M. Assignment of Error 19: Dr. Dunn's expert opinion about A.'s abuse

Father assigns error to the trial court's admission of Dr. Dunn's expert opinion about the cause of A.'s injuries on two grounds.[22] First, father argues that permitting her to give an expert

---

[22] Assignment of Error 19 states:

The trial court erred in admitting Dr. Dunn's expert opinion over objection on two grounds:

- 48 -

opinion approximately a month after she gave a deposition disclaiming any expert opinion was

an unfair surprise to him. Second, father contends that Dr. Dunn was not qualified to give an

expert opinion on whether A. had been abused or not. Again we review these arguments for an

abuse of discretion. Riverside, 282 Va. at 73, 711 S.E.2d at 539.

Rule 4:1(b) includes the requirements for expert designations and states:

> (4) *Trial Preparation: Experts; Costs -- Special Provisions for Eminent Domain Proceedings.* --Discovery of facts known and opinions held by experts, otherwise discoverable under the provisions of subdivision (b)(1) of this Rule and acquired or developed in anticipation of litigation or for trial, may be obtained only as follows:
>
> (A) (i) *A party may through interrogatories require any other party to identify each person whom the other party expects to call as an expert* witness at trial, to state the subject matter on which the expert is expected to testify, and to state the substance of the facts and opinions to which the expert is expected to testify and a summary of the grounds for each opinion.

(Emphasis added).

Father did not propound an interrogatory asking for expert designations, and the

Department brought this fact to the trial court's attention when father objected to Dr. Dunn's

qualification as an expert witness. The Department also noted that despite not receiving this

interrogatory, it produced hundreds of pages of Dr. Dunn's records and notes about A.

Moreover, Dr. Dunn gave several other expert opinions during the same discovery deposition

when she stated she was not testifying as an expert. The trial court noted father's concerns about

the timing but stated that Dr. Dunn's records had been made available to defense counsel and

that she was present in court and subject to cross-examination. Because the Department did not

---

1. That she was not qualified to give an expert opinion on whether [A.] had been abused or not; and
2. That permitting her to give an expert opinion about a month after she gave a deposition disclaiming any expert opinion was an unfair surprise to the defense.

fail to comply with an interrogatory requesting expert designations or pre-trial disclosure of expert opinions and father was aware of the information Dr. Dunn was using to form her opinions, we find that the trial court did not abuse its discretion in allowing Dr. Dunn to qualify as an expert. See Norfolk & Portsmouth Belt Line R.R. Co. v. Wilson, 276 Va. 739, 745, 667 S.E.2d 735, 738 (2008) (holding appellant's claim of error relating to failure to fully comply with Rule 4:1's expert disclosure requirements was moot because appellant was now fully aware of the substance of the expert's testimony if the case were retried on remand).

The second half of father's argument under this assignment of error is that Dr. Dunn, as a pediatrician, was not qualified to give an opinion as to the cause of A.'s injuries. The trial court addressed this issue squarely, noting: "I'll certainly deem her to be an expert in pediatrics . . . . To the extent that her experience with the types of injuries that we're dealing with in this case is limited, that'll go to the weight that I give that testimony as opposed to the qualification." In concluding that father abused A., the trial court did not state that it relied solely on Dr. Dunn's conclusion about the cause of A.'s injuries. The trial court could have completely ignored Dr. Dunn's opinion on this issue and relied solely on Dr. Scherrer's testimony because Dr. Scherrer also concluded that someone intentionally inflicted A.'s injuries.

Even assuming that the trial court accepted Dr. Dunn's conclusion on the issue of abuse, we cannot say that doing so was an abuse of discretion. Code §§ 8.01-401.1 and -401.3 provide applicable guidance for expert witnesses. Code § 8.01-401.1 allows an expert witness to "render an opinion or draw inferences from facts, circumstances or data" she knew or perceived before the hearing, and they need not be admissible in and of themselves if they are "of a type normally relied upon by others in the particular field of expertise . . . ." More pertinent to this case, Code § 8.01-401.3 allows an expert witness to testify to the ultimate issue if she qualifies by "knowledge, skill, experience, training or education." Dr. Dunn concluded that A.'s injuries

were consistent with non-accidental trauma based on her knowledge of A.'s medical history, her experience with trauma injuries in children, and her medical education. She testified that these resources indicated to her that a child with both diffuse, bilateral subdural hematomas and bilateral retinal hemorrhages and no outward signs of physical injury did not incur these injuries accidentally. Dr. Dunn was also A.'s pediatrician from birth, examined him when he came into the hospital on April 30, 2008, and reviewed the reports of the various doctors who treated A. at UVA. These bases comport with our statutes and case law related to expert opinions and do not indicate that Dr. Dunn based her opinion on speculation. Therefore, we find that the trial court did not abuse its discretion in allowing Dr. Dunn to testify to the cause of A.'s injuries.

## IV. CONCLUSION

For the foregoing reasons, we find no merit in any of father's assignments of error. Therefore, we affirm the judgment of the trial court.

Affirmed.