UNPUBLISHED

COURT OF APPEALS OF VIRGINIA


Present: Judges Athey, Friedman and Lorish


STACEY YVETTE LONG

                                                     MEMORANDUM OPINION[*]
v.        Record No. 0362-25-3                               PER CURIAM
                                                         AUGUST 12, 2025
CITY OF LYNCHBURG DEPARTMENT
OF SOCIAL SERVICES


               FROM THE CIRCUIT COURT OF THE CITY OF LYNCHBURG
                              James F. Watson, Judge

               (Carlos A. Hutcherson, on brief), for appellant.

               (Kathryn Laura Jordan Thomas, Assistant City Attorney; Hellen
               Perrow Carrington, Guardian ad litem for the minor children, on
               brief), for appellee.


        Stacey Yvette Long ("Long") appeals the final order of the Circuit Court of the City of

Lynchburg ("circuit court") terminating her residual parental rights pursuant to Code

§ 16.1-283(B), (C)(2). Long assigns error to the circuit court for failing to determine that the

City of Lynchburg Department of Social Services ("the Department") provided her reasonable

services or a reasonable period of time in which to remedy the conditions which led to her

children being placed in foster care. Finding no error, we affirm.[1]

---

[*] This opinion is not designated for publication. See Code § 17.1-413(A).

[1] Having examined the briefs and record in this case, the panel unanimously agrees that
oral argument is unnecessary because "the facts and legal arguments are adequately presented in
the briefs and record, and the decisional process would not be significantly aided by oral
argument." See Code § 17.1-403(ii)(c); Rule 5A:27(c).

I. BACKGROUND[2]

Long is the biological mother of two minor children, M.L.[3] and J.L. The Department's

first recorded involvement with Long and her minor children occurred on March 6, 2017. On

that date, the Department discovered—by listening to recorded jail phone calls—that M.L. and

J.L. had been present when Long used a kitchen knife to stab Brian Miller ("Miller") on

February 19, 2017. The stabbing in the presence of the minor children resulted in Long being

arrested and indicted for malicious wounding. Long admitted that the children were present

during the stabbing and acknowledged the harm visited upon the children. She subsequently

signed a safety plan in which she stated that she would refrain from violence "of any kind."

Long would later say that she "accidentally stabbed" Miller because she was sleep-deprived and

"did not know [she] had stabbed him." She also admitted that "it was not the first time I had

gotten a knife."

The next recorded contact between Long and the Department was on October 7, 2022.

The Department received a report that Long had beaten M.L. after the child walked in on Long

having sex. The report also noted that M.L. had been self-harming as a result of the ordeal.

Relatedly, Miller advised M.L. to hide in a crawl space under Long's house to avoid the police

coming to investigate. Law enforcement subsequently charged Miller with felony child

---

[2] "On appeal, 'we view the evidence and all reasonable inferences in the light most favorable to the prevailing party below,'" so we recite the facts in the light most favorable to the Department. *Joyce v. Botetourt Cnty. Dep't of Soc. Servs.*, 75 Va. App. 690, 695 (2022) (quoting *Farrell v. Warren Cnty. Dep't of Soc. Servs.*, 59 Va. App. 375, 386 (2012)). The record and briefs in this case were sealed. We unseal only the facts stated in this opinion to resolve the issues presented. *Brown v. Va. State Bar ex rel. Sixth Dist. Comm.*, 302 Va. 234, 240 n.2 (2023). The rest of the record remains sealed.

[3] We use initials to protect the minor children's privacy.

endangerment for his actions involving M.L. Long also petitioned for and was granted a protective order against Miller on October 7, 2022, which included M.L. and J.L.

On October 13, 2022, the Department interviewed M.L. and J.L. while they were at school. M.L. told the Department that Miller had shown M.L. the October 7, 2022 protective order and said, "See, this is what your mother is doing to me." M.L. described her home life as chaotic because of the physical arguments and altercations that repeatedly took place between Miller and Long. Both minor children confirmed that they were often present during these arguments and that Miller and Long "try to involve them in the arguments."

On October 17, 2022, the Department interviewed Long, who confirmed the history of domestic violence between her and Miller. Long admitted that her and Miller "fist fight" with each other and that M.L. and J.L. often witnessed those fights. Long further admitted that she violated the terms of the protective order because she spoke to Miller on the phone and that the children did as well. In spite of her violating the protective order, Long told the Department that she planned to seek to extend the protective order against Miller.

That same day, the Department adopted another safety plan to protect the children. The safety plan—signed by Long—stated that Long would not allow Miller "to have supervised or unsupervised contact" with M.L. or J.L. The plan also dictated that Long would "follow the protective order" that was in place between Long, her children, and Miller, and that if Miller violated the protective order that Long would call the police. Additionally, Long agreed in the safety plan to comply with the Department and "any recommended services."

The next day, October 18, 2022, the Department conducted a home visit at Long's residence. Long told the Department that the protective order had been dismissed, but that she intended to appeal the decision. On October 19, 2022, the Department learned that the previous night, Miller had come to Long's residence and smashed the windows and windshield of Long's

car. Long stated that she wanted Miller to leave, but law enforcement could not make Miller leave the residence because the protective order was no longer in place.

On October 20, 2022, Long admitted the previous night's events to the Department. To ensure the safety of the children, the Department requested that Long stay with her sister while the Department filed for a protective order against Miller. Long declined to do so by claiming that the taxi trips to and from work from her sister's home would be too expensive for her. After the Department offered to compensate her for these trips using an Uber gift card, Long claimed that she did not know how Uber worked. After the Department explained how to use Uber, Long still said she did not want to leave her house.

Long then admitted to the Department that she had left M.L. in the care of Miller and that she did not know where they were.[4] The Department then took emergency custody of the children that same day because of the violations of the safety plan. When the Department came to take custody of the children, Miller was present in the home with the children. Long told M.L. that the removal of the children from the home "was all her fault."

On November 16, 2022, the Juvenile and Domestic Relations District Court of the City of Lynchburg ("J&DR court") conducted a hearing regarding the children. In conversations related to the hearing, the Department reiterated that the ongoing domestic violence in the relationship between Long and Miller prevented the Department from being able to recommend that the children return home to Long. Long told the Department that she was going to do "whatever she needed to do" to have custody of her children and that she was going to "leave" Miller. The J&DR court found the children to be abused and neglected under Code § 16.1-228 and set a follow-up hearing for December 21, 2022. After the court hearing concluded, Department staff

---

[4] The charges against Miller stemming from his alleged endangerment of M.L. were still pending at this time.

observed Miller and Long arguing in the court parking lot. Miller was leaning over the door on Long's car, yelling at her. Department staff sought the assistance of a court bailiff, but Long and Miller got in their respective cars and left before law enforcement was able to intervene.

Two days after the J&DR hearing, Long called the Department and stated she "did not understand why" the Department was not allowing Miller to have visitation with the children. Long stated that "she did not know where all of these new allegations were coming from" against Miller. Long claimed that her and Miller were not together but that "they were working on some things." The Department reiterated its concerns about the relationship and communicated what its staff had observed in the court parking lot following the previous J&DR court hearing.

On December 6, 2022, Department staff and a counselor met with Miller. The Department offered Miller parenting resources and counseling, but Miller stated that he "did not want to be involved in this case any longer." Miller admitted that he was in a "toxic relationship" with Long and that M.L. and J.L. were "often around" during the physical confrontations between Miller and Long. Miller also conceded that he used M.L. as a "middle person" in the arguments between him and Long. The Department reminded Miller that it could not recommend a placement at home with Long if Miller remained in a relationship with Long or resided at Long's residence. Despite this, the Department still offered services to Miller because of his relationship with Long, including counseling and parenting services to aid in "learning the negative effects of domestic violence."

By order entered December 21, 2022, the J&DR court noted that it had previously found both children to be, or at risk of being, abused or neglected and that "continued placement in the home would be contrary to the welfare" of the children. The court approved a foster care placement in accordance with the Department's foster care plan. Long was allowed visitation.

-5-

On January 28, 2023, police records indicated that law enforcement were called to Long's residence regarding an altercation between Long and Miller. Long was attempting to place Miller's belongings outside and Miller was preventing Long from doing so. Another call about 45 minutes later indicated that Long had destroyed a kitchen table chair and Miller had gone to the magistrate's office.

In March of 2023, the Department filed a foster care service plan review. In it, the Department noted that it had provided Long with services to address the events that brought M.L. and J.L. into foster care, namely the "toxic relationship" between her and Miller. Despite the prior history with the Department, Miller's belongings remained at Long's home while Miller was away, with no indication that Miller would no longer be living there if the children were returned to Long. The Department noted that it had offered Long outpatient counseling, one-on-one parenting coaching, a psychological assessment, drug screening, parenting classes, domestic violence group classes at the YMCA, and other services as needed. At the time of the foster care plan review, Long was regularly attending most of these services, while Miller was not. The Department's report noted that M.L. and J.L. were doing well in their foster placements, doing well in school, and adjusting well.

On April 29, 2023, police were called to Long's residence for a report that Long had assaulted Miller because Miller had broken up with her. In response, Long had taken Miller's truck keys. Another call about an hour and a half later stated that Miller was trying to break into Long's home. In July of 2023, police were again called to Long's residence regarding domestic violence. The police report noted that Long and Miller had been fighting "all day" because Miller wanted to break up with Long. The report noted that Long assaulted Miller with a brick and a knife and threw a brick at a vehicle. Long claimed that Miller had been assaulting her.

Officers on scene reported that the amount of personal items at Long's house indicated that Miller still lived there, despite Long's claim that Miller was just visiting.

On August 22, 2023, the J&DR court held a permanency planning hearing. The J&DR court approved the new foster care goal of adoption and directed the Department to file petitions for termination of Long's residual parental rights by August 31, 2023. In preparation for the August 22, 2023 hearing, the Department completed a foster care review on July 19, 2023. The review noted that Long continued to have contact with Miller. The Department also noted that Long gave M.L. a cell phone during one of their supervised visits. M.L. stated that she had not been contacting Miller on the cell phone, but an inspection of the cell phone revealed that all history of texts and phone calls had been deleted from the phone. The review also noted the above history of domestic violence between Long and Miller. The Department noted that "although [Long] has been participating in services," her mindset regarding Miller had remained unchanged and the two were "still displaying the same behaviors which create[d] a very unsafe environment for the children to reside in."

On August 31, 2023, the Department sought to involuntarily terminate Long's residual parental rights to M.L. and J.L. On March 12, 2024, the J&DR court ordered that Long's rights be terminated. Long appealed.

On October 25, 2024, the circuit court held a hearing on Long's appeal. At the hearing, Long testified that she had signed the October 17, 2022 safety plan document but didn't remember "what it was." She claimed that she filed the protective order because she "thought [she] was done with" Miller and "wanted him away from [her]." She testified as to the February 2017 incident that her children were "in the house" but "didn't see anything." As to Miller's charge from October 7, 2022, Long was asked if she instructed M.L. "to act like she forgot when she testifie[d] against Mr. Miller," to which Long responded, "I told her because she don't need

-7-

to keep going through that, yes, I did."  Long also testified Miller had choked her in June and that she had received medical attention in conjunction with that event.  When asked why Long had maintained contact with Miller, she said that she "can't just stop" having contact with Miller because of the length of their relationship together.  But when asked immediately afterwards "[w]hat will it take to stop," Long answered, "I have stopped."  When asked about the services offered to her by the Department, Long testified that she completed "[e]very service that [the Department] asked."  But she also stated regarding her parenting coach meetings that her coach "can reach out to me as well" and that she didn't "have time to just call."  She also testified that she "didn't need [the Department's] services."

Mary Rice ("Rice"), Long's counselor, had assisted Long regarding her mental health, domestic violence, parenting, and anger management.  Rice testified that Long's participation in services "fell back significantly" after the J&DR court hearing in March of 2024.  In addition to concerns relating to the children's exposure to domestic violence, Rice expressed concern with Long's inability to control her anger and Long's decision to continue her relationship with Miller.  According to Rice, Long had made "minimal" progress because of her relationship with Miller.  Long told Rice that she had ended her relationship with Miller "about twenty" times.[5]  Rice was skeptical of Long's ability to regulate her emotions and opined that Long was "very dependent upon [Miller] for her emotional needs."  Rice also expressed concern about Long's "inability to show protective capacity" and her "minimal" concern about the children's struggles.

At the conclusion of Rice's testimony, the circuit court determined that the time originally allotted for the trial was inadequate and continued the matter to another date.  The case reconvened on December 12, 2024.

---

[5] Long also reported to the Department that she had ended her relationship with Miller "several times."

On that date, M.L. testified that she did not feel safe when Long and Miller fought. She testified that she observed Miller driving her mother's vehicle in August of 2024 and saw him and Long driving together in November of 2024. M.L. stated that Miller video called her in 2023 on a cellphone that she received from Long and that Long was with Miller during the video call. M.L. also testified that Long "told [her] to lie" in the criminal case against Miller "so [she] could just get it over with." M.L. did not object to the termination of Long's parental rights and did not want to have contact with Long. M.L. testified that Long doesn't "want to leave [Miller] alone" and that Long "want[s] to choose [Miller] over her kids."

Dr. Anthony Wells ("Dr. Wells"), a licensed psychologist, testified that he conducted a psychological evaluation of Long in January of 2023. He testified that in addition to the 2017 stabbing incident, Long had told him of an additional instance of domestic violence where Long was arrested for "wrestling" with Miller and that Miller had a mark on his head where "he hit the light fixture." Dr. Wells recounted how Long admitted to him that she had fabricated the October 7, 2022 protective order, resulting in Miller getting arrested on an outstanding warrant. Long also told Dr. Wells that Miller "[would] not get out of my house" and that she was "trying to figure out a way to do it to get [her] kids back."

The Department also called the caseworker, Rukiya Johnson ("Johnson"), who was involved in the case since October of 2022. Johnson testified that she sent Long a letter on December 19, 2022, listing the services that were being offered to Long. Johnson testified that beginning in February of 2023, Long did attend sessions at the YMCA that dealt with domestic violence. But although Long attended the sessions several times between February and August of 2023, Long did not attend any domestic violence classes in 2024. Johnson also testified that after a court hearing in August of 2023, Miller came to the Department and told Johnson that he and Long "had been together and they would never leave" the home they were staying in.

-9-

Johnson also explained that the Department did not offer Long services regarding intimate partner violence prevention despite the recommendation of Dr. Wells because it "never recommended" returning the children to a home with Miller. According to Johnson, there were 14 reports of domestic violence at Long's home in 2023 and 5 reports of domestic violence at Long's home in 2024.

At the conclusion of all the evidence, the circuit court heard argument from the Department, the guardian ad litem, and Long's counsel. The circuit court took a brief recess to consider the matter and then "came back out" to issue its ruling.[6] By final order, the circuit court ordered that Long's residual parental rights as to both children were terminated under Code § 16.1-283(B), (C)(2).[7] The circuit court also found that the appeal of the dispositional orders from the J&DR court was untimely and therefore dismissed them for lack of jurisdiction. Long appealed.[8]

## II. ANALYSIS

### A. *Standard of Review*

"On review of a trial court's decision regarding the termination of parental rights, we presume the trial court 'thoroughly weighed all the evidence, considered the statutory requirements, and made its determination based on the child's best interests.'" *Joyce v. Botetourt Cnty. Dep't of*

---

[6] The transcript in the record states, "(Whereupon there was a brief recess)," and then four lines later inexplicably denotes, "(Whereupon the matter concluded.)." Long requested the transcripts on December 27, 2024, and filed them in the trial court on January 21, 2025.

[7] The final orders do not contain signatures of counsel or any written objections, only a note stating that the orders were sent to the parties' respective attorneys and the J&DR court on December 17, 2024.

[8] Long's notice of appeal includes the case numbers of those decisions that the circuit court dismissed as untimely appealed. But Long does not raise any argument as to these foster care dispositional cases or assign error to them. Therefore, we do not address them on appeal. *See* Rule 5A:20.

-10-

*Soc. Servs.*, 75 Va. App. 690, 699 (2022) (quoting *Norfolk Div. of Soc. Servs. v. Hardy*, 42 Va. App. 546, 552 (2004)). "Where, as here, the court hears the evidence *ore tenus*, its finding is entitled to great weight and will not be disturbed on appeal unless plainly wrong or without evidence to support it." *Simms v. Alexandria Dep't of Cmty. & Hum. Servs.*, 74 Va. App. 447, 470 (2022) (quoting *Fauquier Cnty. Dep't of Soc. Servs. v. Ridgeway*, 59 Va. App. 185, 190 (2011)). Whether an appellant is entitled to invoke the ends of justice exception is a question of law that this Court reviews de novo. *See Commonwealth v. Bass*, 292 Va. 19, 27 (2016).

> B. *Long waived her objection to the ruling of the circuit court and we decline to apply the ends of justice exception.*

In both of Long's assignments of error, she asserts that the errors were "preserved contemporaneous with the ruling" but her brief does not cite to a page in the record. "No ruling of the trial court . . . will be considered as a basis for reversal unless an objection was stated with reasonable certainty at the time of the ruling, except for good cause shown or to enable this Court to attain the ends of justice." Rule 5A:18. Here, because there is no oral ruling from the circuit court within the transcript, the record does not reflect that an objection to the circuit court's findings was ever brought to the attention of the circuit court. Moreover, since no objection, contemporaneous or otherwise, appears in the record, neither do any grounds for ruling on such an objection appear in the record. Likewise, there is no written objection to the circuit court's final orders from which we could glean the grounds for any objection. Accordingly, Long has waived her alleged assignments of error on appeal.

Long, however, goes further by superficially noting in her assignments of error the "[e]nds of justice, as the portion of the hearing was not transcribed." But Long's brief is devoid of any authority or argument regarding the application of the ends of justice exception to the case at hand. Thus, even if we deem this a request to invoke the ends of justice exception to Rule

5A:18, we decline to do so since the record contains adequate evidence to support the circuit court's ruling and Long fails to affirmatively assert or demonstrate that a miscarriage of justice occurred requiring reversal of the termination orders.[9]

"[A]pplication of the ends of justice exception 'requires a determination not only that there was error . . . but also that application of the exception is necessary to avoid a grave injustice.'" *Lacey v. Commonwealth*, 54 Va. App. 32, 46 (2009) (quoting *Charles v. Commonwealth*, 270 Va. 14, 20 (2005)); *see Holt v. Commonwealth*, 66 Va. App. 199, 209 (2016) (en banc) (stating that the ends of justice exception applies only where an appellant "affirmatively show[s] that a miscarriage of justice has occurred" (quoting *Redman v. Commonwealth*, 25 Va. App. 215, 221 (1997))). "The ends of justice exception is narrow and is to be used sparingly." *Redman*, 25 Va. App. at 220-21. "This high standard is essential to buttress the principle that 'a litigant has the responsibility to afford a court the opportunity to consider and correct a perceived error before such error is brought to the appellate court for review.'" *Brittle v. Commonwealth*, 54 Va. App. 505, 513 (2009) (quoting *Williams v. Gloucester Sheriff's Dep't*, 266 Va. 409, 411 (2003)).

Virginia law allows a court to terminate parental rights if:

> The parent or parents, without good cause, have been unwilling or unable within a reasonable period of time not to exceed 12 months from the date the child was placed in foster care to remedy substantially the conditions which led to or required continuation of the child's foster care placement, notwithstanding the reasonable and appropriate efforts of social, medical, mental health or other rehabilitative agencies to such end.

---

[9] Rule 5A:18 contains an additional exception "for good cause shown," but Long does not invoke this exception and we will not do so sua sponte. *See Williams v. Commonwealth*, 57 Va. App. 341, 347 (2010). We also note that the "burden is upon the appellant to provide us with a record which substantiates the claim of error." *Jenkins v. Winchester Dep't of Soc. Servs.*, 12 Va. App. 1178, 1186 (1991); *see* Rule 5A:8.

Code § 16.1-283(C)(2). Proof that a parent, without good cause, has "failed or been unable to make substantial progress towards elimination of the conditions which led to or required continuation of the child's foster care placement in accordance with their obligations under . . . a foster care plan filed with the court . . . shall constitute prima facie evidence of this condition." *Id.* "[P]arental rights cannot be terminated '[i]n the absence of evidence indicating that "reasonable and appropriate efforts" were taken by social agencies to remedy the conditions leading to foster care.'" *Joyce*, 75 Va. App. at 701 (second alteration in original) (quoting *Weaver v. Roanoke Dep't of Hum. Res.*, 220 Va. 921, 928-29 (1980)). Whether the Department made such reasonable and appropriate efforts "can only be judged with reference to the circumstances of a particular case." *Id.* (quoting *Harrison v. Tazewell Cnty. Dep't of Soc. Servs.*, 42 Va. App. 149, 163 (2004)).

Here, the record supports the circuit court's finding that the Department made reasonable and appropriate efforts in this case and that Long was afforded a reasonable time in which to remedy the conditions which led to the children's foster care placement. Long and Miller engaged in nearly a decade of domestic violence, with Long and Miller both admitting that the children often witnessed their altercations and that they involved the children in their arguments. Long minimized the 2017 stabbing of Miller, characterizing it as "accidental" and that she was unaware that she stabbed him. She stated that they would "fist fight," that Miller had hit his head on a light fixture while they were "wrestling," and that Miller had choked her. Despite the Department's safety plan, Long resisted the Department's efforts to relocate her, left M.L. in the care of Miller while his criminal charges were still pending, and then blamed M.L. for the Department removing the children from the home. In addition to beating M.L. after the child walked in on Long having sex, Long admitted that she told M.L. to lie during the criminal proceedings against Miller.

Moreover, despite repeated attempts by the Department, Long remained in the "toxic relationship" with Miller even though she contended that she had ended the relationship numerous

-13-

times. Long testified that she couldn't "just stop" having contact with Miller, but then inexplicably later testified that she had stopped. The Department provided Long with counseling, parenting classes, domestic violence services, and psychiatric services. Despite attending many of these various appointments set up by the Department, Long only made "minimal" progress and her toxic behavior remained unaffected. As a result, her ongoing domestic violence with Miller continued to create a negative environment that prevented the Department from recommending that the children be returned to Long.

Although Long testified that she "didn't need" the services of the Department, she asserts that the failure of the Department to offer recommended services from her psychiatrist is enough to assign error to the circuit court, and, by extension, meet her burden under the ends of justice exception. However, as Johnson testified, the services in question were not offered because the Department never recommended that the children return home to Long if Miller was still a part of their life. The multiple police responses to Long's home in 2023, along with Long providing M.L. with a cell phone used to communicate with Miller, demonstrate that Long's behavior and contact with Miller remained unchanged even after the children were placed into foster care. The Department further noted 14 reports of domestic violence at Long's home in 2023 and 5 reports of domestic violence at Long's home in 2024.

The children were removed from the home on October 20, 2022. Long was later informed that the Department could not recommend returning the children to her while she remained in a relationship with Miller because of their long history of domestic violence. The children were adjudicated abused and neglected on November 16, 2022, and placed in foster care on December 21, 2022. The J&DR court terminated Long's parental rights on March 12, 2024, nearly 16 months after the children entered foster care, and the circuit court heard evidence de novo nearly two years

after the children first entered foster care. As the record reflects and M.L. testified, Long chose Miller over her own children.

Thus, the record supports the circuit court's conclusion that the Department's efforts to provide Long with rehabilitative services were reasonable and appropriate and further that Long was unwilling or unable to remedy substantially the conditions which led to the children's placement in foster care within a reasonable period of time. By the time of the circuit court hearing, the children had been in foster care for nearly two years and were adjusting well to their foster homes. "It is clearly not in the best interests of a child to spend a lengthy period of time waiting to find out when, or even if, a parent will be capable of resuming his [or her] responsibilities." *Tackett v. Arlington Cnty. Dep't of Soc. Servs.*, 62 Va. App. 296, 322 (2013) (alteration in original) (quoting *Kaywood v. Halifax Cnty. Dep't of Soc. Servs.*, 10 Va. App. 535, 540 (1990)). Because the record demonstrates that termination of parental rights under Code § 16.1-283(C)(2) was in the children's best interests, Long has failed to show that the circuit court erred in terminating her residual parental rights or that a miscarriage of justice has occurred as a result of that determination. Therefore, we affirm the circuit court's judgment.[10]

## III. CONCLUSION

For the foregoing reasons, we affirm the circuit court.

*Affirmed.*

---

[10] "When a lower court's judgment is made on alternative grounds, this Court need only determine whether any of the alternatives is sufficient to sustain the judgment." *Castillo v. Loudoun Cnty. Dep't of Fam. Servs.*, 68 Va. App. 547, 574 n.9 (2018). Given our conclusion that the trial court did not err in terminating Long's parental rights under Code § 16.1-283(C)(2), we do not address whether it properly relied on Code § 16.1-283(B) when it terminated her parental rights.