COURT OF APPEALS OF VIRGINIA

Present:   Chief Judge Decker, Judges Ortiz and Chaney
Argued at Fairfax, Virginia

EDITH KERCH

v.        Record No. 0968-24-4

FAIRFAX COUNTY DEPARTMENT
 OF FAMILY SERVICES, ET AL.

MEMORANDUM OPINION[*] BY
CHIEF JUDGE MARLA GRAFF DECKER
OCTOBER 14, 2025

FROM THE CIRCUIT COURT OF FAIRFAX COUNTY
Michael F. Devine, Judge

Edith Kerch (Harold N. Ward, Jr.; The Ward Law Office, P.C., on
brief), *pro se*.

Sarah W. Townes, Assistant County Attorney (Elizabeth D. Teare,
County Attorney; Kimberly P. Baucom, Deputy County Attorney;
Shirley A. Norman-Taylor; Law Offices of Shirley A. Norman-
Taylor, PLLC, on brief), for appellees.

(Maria Patente; The Law Office of Maria T Patente PLLC, on brief),
Guardian ad litem for the minor children.  Guardian ad litem
submitting on brief.

Edith Kerch (mother) appeals the circuit court's dispositional orders ruling that she

abused or neglected her children and awarding primary physical custody of them to Jeffrey

Kerch (father).  She argues that the evidence did not support either the circuit court's abuse-or-

neglect findings or its placement of the children with their father.  We hold the circuit court did

not err and affirm the dispositional orders.[1]

---

[*] This opinion is not designated for publication.  *See* Code § 17.1-413(A).

[1] After briefing but before oral argument, the mother filed various documents in this
Court that she characterized as "additional evidence."  We do not consider those documents.  *See*
*Graydon Manor, LLC v. Bd. of Supervisors*, 79 Va. App. 156, 164 (2023) ("[A]ppellate courts do
not ordinarily take evidence[.  R]ather, appellate courts rely upon the record generated by the

The mother and father are the divorced, biological parents of J.K., a girl, and C.K., a boy, twins born in 2015. Following the divorce, the mother had primary physical custody of the children. She introduced her boyfriend, Brian Aleshire, to the children when they were five years old. According to the mother, Aleshire had "mental health issues," including anxiety, and was a recovering alcoholic. He lived in the mother's home for about two years, and he watched the children when she was at work. According to the children, Aleshire frequently hit both of them. The Fairfax County Department of Family Services (the Department) received several reports about the abuse between September 2022 and January 2023 and had ongoing involvement with the family.

On February 19, 2023, shortly before the children's eighth birthday, the Department learned that J.K. had sustained a black eye, bruising to her face, and a bruise on her ankle. J.K. told Megan Arias, a Child Protective Services (CPS) supervisor, that she got the eye injury when Aleshire pushed her against a wall and "smacked [her] face." Aleshire claimed, by contrast, that J.K. hit her eye on his collarbone while they were wrestling. He denied "ever physically disciplin[ing] the children." The mother, although she was not present when the injuries occurred, confirmed that she saw the bruising to J.K.'s face on February 17, 2023, before the

_____

courts below."). Nor do we consider claims of error presented during oral argument that were not raised in the circuit court, on brief in this Court, or both. *See, e.g.*, *Stokes v. Commonwealth*, 61 Va. App. 388, 396-97 (2013), *cited with approval in Tackett v. Arlington Cnty. Dep't of Hum. Servs.*, 62 Va. App. 296, 324 (2013) (recognizing that these principles bar constitutional claims).

[2] On appeal, "we view the evidence in the light most favorable to the prevailing party, in this case, the [Fairfax County] Department [of Family Services], and grant to it all reasonable inferences fairly deducible from the evidence." *King v. King George Dep't of Soc. Servs.*, 69 Va. App. 206, 210 (2018) (quoting *Farrell v. Warren Cnty. Dep't of Soc. Servs.*, 59 Va. App. 375, 420-21 (2012)). The record in this case was sealed. To the extent this opinion discusses facts contained in the record, we unseal only the specific facts stated in this opinion. *See Brown v. Va. State Bar ex rel. Sixth Dist. Comm.*, 302 Va. 234, 240 n.2 (2023); *Levick v. MacDougall*, 294 Va. 283, 288 n.1 (2017). The remainder of the record remains sealed.

father picked up the children. She did not believe that Aleshire had assaulted J.K. "and instead blamed [the father] for influencing [the child]" to falsely accuse him. Arias reminded the mother about the numerous calls the Department had received expressing "concerns" over "Aleshire's behavior toward[] the children."

Based on the Department's history with the family and its investigation of J.K.'s most recent injuries, it asked the mother to consent to a safety plan excluding Aleshire from her home. The mother refused to comply without a court order, but she agreed to let the children stay with the father for a few more days. She then told the Department that she recorded J.K. in a phone call recanting her report that Aleshire hit her. The phone call violated the mother's temporary agreement, included as part of the safety plan, that she would not speak to the children.

Due to concerns over the mother's unwillingness to keep Aleshire away from the children, the Department petitioned the juvenile and domestic relations district court (JDR court) to enter protective orders based on allegations of abuse and neglect. An affidavit of Travisa Skinner, a Department social worker, accompanied the petitions. The affidavit summarized ten reports that the Department had received in the previous eleven months and the Department's resulting contacts with the family.

On February 22, 2023, the JDR court granted preliminary protective orders against the mother and Aleshire and placed the children with the father. About a week later, it found that the mother had abused or neglected the children. In April 2023, the JDR court entered dispositional and protective orders granting the father physical custody, limiting the mother's visitation in the Department's discretion, and prohibiting contact between Aleshire and the children. The orders incorporated Skinner's affidavit as part of the evidence considered.

The mother appealed the JDR court orders to the circuit court, and a hearing on the appeal was held in May 2024. Like the JDR court, when the circuit court entered its

dispositional orders, it incorporated the Skinner affidavit as part of "the factual basis for [their] entry."[3] Numerous witnesses testified at the evidentiary hearing, including both children, who were nine years old at the time, and both parents. The court also heard from two Department employees whose investigative reports were set out in the affidavit. Additionally, Dr. William Hauda, who qualified as an expert in pediatric forensic medicine, testified about examining J.K. within days of her February 2023 injuries. And Dr. William Ling, a licensed clinical psychologist, related the results of his court-ordered psychological and parenting-capacity assessment of the mother.

J.K. testified that Aleshire "hit [her] many times" and "gave [her] bruises." She confirmed that he "hit [her] on the eye" on February 17, 2023, causing the injuries to her face seen around that time and shown in photographs admitted into evidence. C.K. testified that Aleshire hit both him and his sister. About two months before Aleshire inflicted J.K.'s black eye, he "smack[ed]" C.K. in a similar fashion on his nose and mouth, causing his nose to bleed. According to C.K., he used a piece of paper that he kept under his bed at his mother's home to keep track of how many times he saw Aleshire hit his sister, and it was seventy-one or seventy-two times.

The record contained additional evidence that corroborated the children's reports that Aleshire hit them. And the evidence as a whole established that although the mother was aware that Aleshire posed a threat to the children's physical and emotional health, she failed to protect

---

[3] The mother did not contemporaneously object to the circuit court's consideration of the affidavit. Although her attorney endorsed the orders "Seen and Objected to," he did not include any specific basis for his objection. Consequently, we consider the contents of the affidavit. *See generally Bethea v. Commonwealth*, 297 Va. 730, 743 (2019) (requiring that an objection be both timely and specific to preserve a claim of error under the contemporaneous objection rule); *Cooper v. Commonwealth*, 54 Va. App. 558, 574 n.6 (2009) (holding that hearsay testimony "'admitted without objection[]' . . . may 'properly be considered' and 'given its natural probative effect'" (quoting *Baughan v. Commonwealth*, 206 Va. 28, 31 (1965))).

them.  Finally, the court received testimony about the suitability of the father, his residence, and his support network for purposes of child custody.

After considering the evidence and argument, the circuit court found that Aleshire was "a danger to the[] children" and the mother's "judgment [of him] was extraordinarily clouded," resulting in her failure to protect them.  It also concluded that the father had provided them with "more than adequate" care.  The court found the children were abused or neglected because the mother failed to protect them from Aleshire.  It awarded the father sole legal custody and primary physical custody.  The court left the protective orders against Aleshire in place but dissolved the protective orders against the mother and granted her supervised visitation.

ANALYSIS

The mother contends that the circuit court erred by concluding that she abused or neglected the children.  She also argues that the court's award of primary physical custody to the father was an abuse of discretion.

When a circuit court "address[es] matters concerning a child, . . . the paramount consideration . . . is the child's best interest." *Tackett v. Arlington Cnty. Dep't of Hum. Servs.*, 62 Va. App. 296, 328 (2013) (quoting *Logan v. Fairfax Cnty. Dep't of Hum. Dev.*, 13 Va. App. 123, 128 (1991)).  And the circuit court has the opportunity to see and hear the witnesses as they testify, so it is "responsib[le for assessing] the[ir] credibility . . . and determining the weight to be given to [thei]r testimony." *Id.* at 338.  When the appellate court examines a challenge to the sufficiency of the evidence to support such a determination, it "view[s] the evidence in the light most favorable to . . . the prevailing party below," in this case the Department.  *Farrell v. Warren Cnty. Dep't of Soc. Servs.*, 59 Va. App. 375, 418 (2012).  The appellate court is "bound by the credibility findings of the circuit court." *Tackett*, 62 Va. App. at 339.  And it must "affirm the [circuit] court's determination unless it was plainly wrong or without supporting evidence."

*Farrell*, 59 Va. App. at 418. We review the mother's assignments of error in light of these well-established legal principles.

### I. Sufficiency of the Evidence to Prove Abuse or Neglect

The mother contends that the circuit court erred by finding the evidence was sufficient to prove that she abused or neglected the children. She suggests that J.K. could not remember specifically how she was injured and that C.K. "was not subjected to a physical injury at all." She also argues that the evidence did not show that she was an unfit parent.[4]

A court may remove a child from a parent's custody when the child is alleged to have been abused or neglected. *See* Code §§ 16.1-251 (emergency removal orders), -252 (preliminary removal orders). An abused or neglected child includes one "[w]hose parent[] . . . creates or inflicts, threatens to create or inflict, or allows to be created or inflicted upon such child a physical or mental injury by other than accidental means, or creates a substantial risk of death, disfigurement or impairment of bodily or mental functions." Code § 16.1-228(1). "[T]he statutory definitions of an abused or neglected child do not require proof of actual harm or impairment . . . ." *Farrell*, 59 Va. App. at 416 (first alteration in original) (quoting *Jenkins v. Winchester Dep't of Soc. Servs.*, 12 Va. App. 1178, 1183 (1991)). "The term 'substantial risk'" as used in Code § 16.1-228(1) "speaks *in futuro*." *Id.* (quoting *Jenkins*, 12 Va. App. at 1183). Finally, abuse or neglect must be proved by a preponderance of the evidence. *See Cumbo v. Dickenson Cnty. Dep't of Soc. Servs.*, 62 Va. App.

---

[4] The mother further contends that the circuit court's abuse-or-neglect finding was contrary to her "parental privilege" to "discipline . . . [using] corporal punishment." But the mother did not make that argument below. "No ruling of the trial court . . . will be considered as a basis for reversal unless an objection was stated with reasonable certainty at the time of the ruling, except for good cause shown or to enable this Court to attain the ends of justice." Rule 5A:18. So this Court will not consider that claim for the first time on appeal. *See Bethea*, 297 Va. at 743 ("Procedural-default principles require that the argument asserted on appeal be the same as the contemporaneous argument at trial."); *id.* at 744 (holding that an appellant is prohibited even from "put[ting] a different twist on a question" (quoting *Commonwealth v. Shifflett*, 257 Va. 34, 44 (1999))).

124, 130 (2013); *see also Henrico Cnty. Sch. Bd. v. Etter*, 36 Va. App. 437, 446 (2001) (defining a preponderance of the evidence as meaning "more probable than not" (quoting *Duffy v. Commonwealth*, 22 Va. App. 245, 251 (1996))).

We first address the mother's complaint that the evidence did not prove she was an unfit parent. The circuit court did not conclude that she was unfit, so this claim simply does not address any aspect of the circuit court's ruling. *See generally* Rule 5A:20(c) (requiring the appellant's brief to identify "the specific errors in the rulings below . . . upon which the party intends to rely"). Proof of parental unfitness is simply not required to establish that a parent abused or neglected her child.[5] *See* Code § 16.1-228(1) (defining "[a]bused or neglected child"). We therefore do not consider this argument further.

We turn next to the primary focus of the mother's first assignment of error, her contention that the record failed to prove that she abused or neglected her children. The evidence, viewed in the light most favorable to the Department, supports the circuit court's finding of abuse or neglect.

To begin, the evidence proved that Aleshire, whom the mother allowed to watch her children while she worked, hit both children many times and caused obvious injuries to J.K. that led to the involvement of the Department. Although J.K. said at the evidentiary hearing that she could not recall specifically how Aleshire inflicted the injury that resulted in her black eye on February 17, 2023, more than a year earlier, she also testified that Aleshire hit her and confirmed that he "cause[d] th[e] injury." The circuit court, as the finder of fact, assessed her credibility and accepted her testimony naming him as her abuser. *See Kelley v. Commonwealth*, 69 Va. App. 617, 626 (2019) (observing that "'[p]otential inconsistencies in testimony are resolved by the fact

---

[5] Abuse and neglect may prove the parental unfitness needed to terminate parental rights. *See* Code § 16.1-283(B), (D); *Farrell*, 59 Va. App. at 403. But this is not a termination case.

finder,' not the appellate court" (quoting *Towler v. Commonwealth*, 59 Va. App. 284, 292 (2011))).

Additional evidence in the record supported J.K.'s testimony. Within just a few days of receiving the facial injuries, when the incident was fresh in her mind, J.K told Arias how she sustained them. She explained that Aleshire, who was "mad because '[she] ate a little too much food,'" "pushed [her] against the wall" and "smacked [her] face." Additionally, Dr. Hauda opined that the pattern of bruising reflected an intentional strike with a hand, not an accidental injury as Aleshire claimed. And J.K. was hit hard enough to experience double vision for several days afterward, causing concern that she might have a mild concussion. The mother's testimony, supported by that of Dr. Hauda regarding the age of the injuries, indicated that J.K. sustained them while under Aleshire's supervision.

At the time of J.K.'s February 2023 facial injuries, the Department had already investigated two earlier incidents of physical abuse against her, one in which Aleshire hit her in the eye because she was eating too slowly and another when he "grabbed her head and hit it on the couch" because she was late for school. And her brother reported to Department staff that Aleshire hit J.K. and "smacked [her] in the face 'all the time'"—hitting her seventy-one or seventy-two times—and had "slapped him in the face twice." C.K. elaborated that once when Aleshire hit him in the face, he got a bloody nose. The evidence therefore proved that Aleshire physically abused both children and both were at risk of future harm if left alone in his care.

The evidence also supports the circuit court's conclusion that the mother abused or neglected the children by failing to protect them. She admitted to a social worker that Aleshire had "mental health issues," including anxiety that sometimes caused him to "become[] agitated." But she failed to take proper precautions despite numerous reports of Aleshire's abuse investigated by the Department in the months leading up to J.K.'s February 2023 facial injuries and possible

concussion. C.K. twice reported to the Department prior to that date that "sometimes" the mother would "come[] to the rescue'" and "try to protect them" when she saw Aleshire "hit or throw the[ children]," indicating that the mother was present for at least some of the abuse and knew about his violent tendencies. And the mother told the Department in January 2023 that she had cameras in her home allowing her to "observe [the children] at any time to ensure their safety." A month later, however, when a social worker noticed a camera pointed directly at the wrestling mat where Aleshire said he injured J.K. accidentally, the mother said she could not check the video footage, ostensibly because she had forgotten her password. A few days after that, she told a social worker that the cameras had not worked in three years. This evidence supported a finding that the mother was aware of Aleshire's abuse and was attempting to protect him rather than her children. Dr. Ling testified that the mother had "restrict[ed] . . . insight" in that she did not seem to believe that the abuse was occurring and "gloss[ed] over her own [role]" in permitting it to happen.

The mother, for her part, admitted that she had previously been interviewed by the Department regarding Aleshire's reported behavior. But she denied that he had harmed the children. In fact, she trusted him to watch the children for even longer periods of time when she removed them from school in January 2023.[6] Even so, the mother admitted at trial that Aleshire had been abusive toward her. She testified about two incidents that prompted her to call the police to seek Aleshire's removal from her home, both of which occurred days before J.K.'s February 2023 injuries. Despite knowing about his abusive nature, she allowed Aleshire to watch the children throughout that period, including on February 17, 2023, the very day after her second call to the police about him—the day he gave her a black eye.

___

[6] Aleshire was barred from the children's school after pushing a crossing guard in their presence, but he was still permitted to transport them to and from the edge of the school's property. The mother, however, removed them from school with plans to homeschool them.

- 9 -

The record therefore fully supports the circuit court's conclusion that the mother abused or neglected the children by not protecting them from the risk of serious harm by Aleshire. *See Farrell*, 59 Va. App. at 416 (recognizing the adequacy of proof of a substantial future risk).

## II. Sufficiency of the Evidence to Support the Custody Determination

The mother contends that the circuit court abused its discretion by placing the children with the father. She argues that the evidence showed the best interests of the children compelled the court to award primary physical custody to her instead.

Code § 20-124.3 requires a court to consider the "best interests of a child [when] determining custody or visitation." "The circuit court has 'broad discretion in making the decisions necessary to guard and to foster a child's best interests.'" *Wynnycky v. Kozel*, 71 Va. App. 177, 193 (2019) (quoting *Eaton v. Dep't of Soc. Servs.*, 66 Va. App. 317, 324 (2016)). The abuse-of-discretion standard—a "bell-shaped curve of reasonability governing our appellate review"—"rests on the venerable belief that the judge closest to the contest is the [one] best able to discern where the equities lie." *Thomas v. Commonwealth*, 82 Va. App. 80, 118 (2024) (en banc) (quoting *Commonwealth v. Barney*, 302 Va. 84, 94 (2023)); *see Wynnycky*, 71 Va. App. at 204 n.14. "A [circuit] court's determination with regard to [custody and] visitation is reversible only upon a showing that the court abused its discretion." *Wynnycky*, 71 Va. App. at 193 (second alteration in original) (quoting *Bedell v. Price*, 70 Va. App. 497, 504 (2019)). To reverse under this standard, this Court must determine that "no reasonable jurist could have reached th[e challenged] conclusion" on the specific facts of the case. *Id.* at 204; *see id.* at 193.

Code § 20-124.3 lists the factors a court must consider in evaluating the "best interests of a child" and requires it to convey "the basis of [its] decision either orally or in writing." Although failing to consider all the factors is reversible error, the court "is not 'required to

quantify or elaborate exactly what weight or consideration it has given to each [one]." *Brandon v. Coffey*, 77 Va. App. 628, 636 (2023) (quoting *Wynnycky*, 71 Va. App. at 201).

Here, the circuit court stated that it considered all of the statutory factors. And it expressly mentioned almost every factor in detailing why granting the father primary physical custody placed the children "in the best situation that the current circumstances allow[ed]." The court specifically found that the father provided "a stable environment[ in] a good home" and had a "support system" that included the children's paternal grandmother. The court commended his effort "to maintain his relationship with the children" while also "manag[ing] his work responsibilities." It emphasized that the children, by living with the father, were "not . . . in the hands of an abuser on a daily basis." According to the court, the mother "need[ed] to understand . . . her failures" in this area and "recognize Mr. Aleshire as [the children's] abuser." The court acknowledged it was not ideal that the nine-year-old children had to get themselves to school several mornings a week. Even so, it "d[id no]t see any major problems with" the arrangement, which involved the father's "reasonable steps to . . . keep them under his watch" during that period of time. Finally, the court noted it had "no reasonable belief that the [parties] c[ould] coparent."

The evidence supports the circuit court's findings. It proved that the father provided adequate housing, food, sleeping arrangements, and childcare following the children's removal from the mother's home. Initially, while the children were seven and eight years old, their paternal grandmother and then a "morning nanny" walked them to school several mornings a week, and the father walked them to school himself on the days he did not work. The grandmother also provided care after school as needed until the children were admitted to an after-care program at their school. When the children turned nine, the Department approved the father's decision to allow them to get themselves ready and to school, which was no more than

- 11 -

half a mile away, three mornings a week while their father, already at work, remained on the phone with them. The paternal grandmother also provided care for the children at her home during the summer, with the father visiting regularly on his days off. At the time of the April 2024 hearing, the father had maintained custody for fourteen months, during which he assembled an appropriate support network for the children and willingly consulted with the Department as needed. He also testified that he supported telephone contact and supervised visitation between the children and the mother. The Department expressed no concerns about the children's adjustment to their new living arrangements or the father's ability to meet their social, emotional, and educational needs.

The mother, by contrast, conceded at the evidentiary hearing that she was unemployed and lived in a camper with no fixed address. As detailed previously, she knew Aleshire abused the children and failed to protect them. Yet she "blamed [the father] for influencing" J.K. to falsely accuse Aleshire when the child reported to the Department that Aleshire had hit her. And although she claimed to have cut ties with Aleshire by June 2023, the record makes clear that she did not. Aleshire threatened the father by phone several months later when the father was forced to cancel the mother's visitation because one of the children was sick. Finally, during supervised visitation around that same time, the mother gave the children a photograph of themselves with her and Aleshire. She told them that he loved them, despite receiving clear instructions not to discuss him with the children due to the history of abuse.

The mother argues that the size of the father's home and the sleeping arrangements there, as well as the father's childcare practices and personal time spent with the children, were inadequate. In making these assertions, however, the mother fails to view the evidence under the proper standard—in the light most favorable to the Department, the party who prevailed below. *See Farrell*, 59 Va. App. at 418. That failure includes her attempt to characterize the needs of

- 12 -

the children and the conditions in her own home in the best possible light and as they existed at the time of the removal. The mother ignored the conditions as they existed at the time of the hearing, when she was unemployed and living in a camper. She also ignored the evidence of Aleshire's repeated abuse, as well as her failure both to protect the children from it and to obey the subsequent court-ordered requirement that she not discuss Aleshire with the children.

In sum, the evidence, viewed under the proper standard, simply does not support a holding that no reasonable jurist could have awarded primary physical custody of the children to the father. *See Wynnycky*, 71 Va. App. at 193, 204. Accordingly, the circuit court's award of primary physical custody to the father was not an abuse of discretion.

CONCLUSION

We hold that the evidence, viewed under the proper standard, supports the circuit court's determination that mother abused or neglected the children and that their best interests supported awarding the father primary physical custody. Consequently, the circuit court's judgment is affirmed. We remand the case to the circuit court to correct a clerical error in one of the circuit court's dispositional orders.[7]

*Affirmed and remanded.*

---

[7] At the May 29, 2024 hearing, the circuit court stated that it found both children abused or neglected. And the first "DATE" blank on page three of the dispositional order pertaining to J.K. lists that date as when it adjudicated J.K. abused or neglected. The same blank on page three of the dispositional order pertaining to C.K., however, appears to list the date on which the JDR court adjudicated C.K. abused or neglected. We remand to the circuit court for correction of this apparent clerical error. *See* Code § 8.01-428(B); *Marvin v. Marvin*, 51 Va. App. 619, 621 n.1 (2008).